**STATE of Utah, in the Interest of P. L. L., a person under 18 years of age.**

No. 15947.

Supreme Court of Utah.

June 26, 1979.

---

Utah Legal Services, Inc., James R. Hasenyager, Ogden, for appellant.

Robert B. Hansen, Atty. Gen., Franklyn B. Matheson and Sharon Peacock, Asst. Attys. Gen., Salt Lake City, for respondent.

HALL, Justice:

Appeal from a juvenile court decision permanently terminating all parental rights of appellant in connection with her child, P. L. L.

On July 10, 1973, appellant gave birth to her daughter P. L. L. out of wedlock. The child was born handicapped with a cleft palate, a hole in her throat, a possible hearing loss, a turned out right foot, and an anticipated susceptibility to respiratory disease. Appellant has a low intelligence level, having spent several years at the Utah Training School in American Fork.[1]

Shortly after birth, the child was placed in the custody of the Utah Division of Family Services ("DFS").[2] After that time

---

1. A state institution for the mentally retarded.

2. This was pursuant to a prior order of the juvenile court which was never challenged.

there were no visitations arranged between mother and daughter until November 1973 when one Dave Mullens, a DFS caseworker, acquired the case. While he was responsible for the case, several visitations between mother and daughter were arranged. The visits took place at the DFS offices because Mullens did not consider appellant's living quarters appropriate for the child. Between June or July, 1974 until June 1975 another caseworker, Vickie Rowe, was given the responsibility of managing the case. Rowe also arranged for several visitations between appellant and her child, some for overnight in appellant's home. At the beginning of each visit, Rowe gave appellant specific instructions on feeding, bathing and bedtime, with emphasis on the child's cleft palate and special feeding needs. Appellant was also referred to the Skills Center of Weber County Mental Health for the purpose of attending parenting classes and receiving specialized instruction in parenting skills.

No visitations were arranged after the March 29, 1975, Easter visitation until October 17, 1975, after one Deola Gearhart, yet another caseworker, had assumed responsibility for the case. Another visit was arranged at Christmas, 1975 but between December 1975 until March 1977 appellant requested no further home visitations with her daughter and none was arranged.

On January 10, 1977, the juvenile court scheduled a review of DFS custody of P. L. L. On March 2, 1977, the court ordered that the child's grandparents be allowed visitation but that appellant's visitation be worked out with DFS. (Appellant was denied custody.) On November 28, 1977, the petition was filed which sought termination of appellant's parental rights. After several delays, trial was held on June 15, 1978, which resulted in the termination order now appealed.

3. U.C.A., 1953, 78–3a–48(1)(a)

4. Citing *In Interest of Winger*, Utah, 558 P.2d 1311 (1976).

Appellant asserts several points of error on appeal. The most basic of these is that the evidence is insufficient to support the finding of the court that the appellant is unfit or incompetent by reason of her conduct or condition to the serious detriment of her child.[3] She specifically claims that her inadequacies are not such substantial departures from the norm as to sustain a decree of termination.[4] The state correctly points out that the task of the juvenile court is to determine whether *this* mother's conduct or condition is seriously detrimental to *this* particular child. In assessing the situation, the ranking of a parent's "intelligence" may be considered. Appellant was classified by expert witnesses as being borderline mentally retarded, ranking in the lower 1 to 6 percentile of the population. The intelligence level of a parent, standing alone, is not generally sufficient to determine parental rights. However, other things were considered in this instance. Appellant was diagnosed by experts as having a passive dependent personality, which was described as meaning that she takes a passive stance in life, depending on others to provide her with the basic necessities of life. After hearing the expert testimony the juvenile court made the following finding of fact:

. . . That [appellant] is incompetent by reason of conduct or conditions seriously detrimental to the above-named child. That training might assist the mother in providing basic survival care for the child, but that it would not enable her to provide the child with proper parental care and protection.

The court did not say appellant is incompetent as a parent generally, but that given her limitations and the special needs of her handicapped child she could not provide the proper care to P. L. L.[5] We have previously held that children require more than basic survival care; they also require and deserve at least *some* degree of intellectual, emo-

5. Appellant has another child who is apparently in the custody of appellant's own parents in Nebraska.

tional, and social stimulation so as to develop properly.[6]

■ Clearly, the termination order must be supported by a preponderance of the evidence,[7] and the general rule of review that we will usually defer to the trial court's factual findings, applies to juvenile proceedings.[8] The testimony presented at trial showed that after the various home visitations, P. L. L. was usually returned very dirty, tired, and improperly clothed. The record is replete with testimony not only that appellant is incapable of training the child to fit into society in a reasonably adequate fashion, but may be unable to even provide for the child's basic survival.

■ Appellant claims that DFS failed to reasonably assist her in correcting the conduct or condition alleged to be seriously detrimental to the child.[9] A related claim is also made, that DFS should be estopped from seeking a termination of parental rights because of its allegedly deliberate plan calculated to destroy the parent-child relationship. Neither claim can be supported by the record.

For over four years, DFS worked with appellant to provide her the opportunity to learn how to care and provide for her child. Numerous home visits were arranged between mother and child. The mother was instructed by caseworkers as to the basic requirements of child care. She was referred to the Skills Center, as noted *supra*, for the purpose of receiving specialized instruction in parenting skills. The state's efforts in assisting appellant were reasonable and in compliance with our prior rulings.

■ Finally, there is no merit to appellant's claim that her Fifth Amendment privilege against self-incrimination was violated when the trial court required her to testify. The Fifth Amendment privilege against self-incrimination does not allow a witness to refuse to testify altogether. It comes into operation only where a specific question is asked,[10] the answers to which might later subject the witness to criminal prosecution.[11] Our perusal of the record indicates that appellant's testimony produced no evidence which might subject her to future criminal prosecution. In any event, appellant made no claim to the privilege at trial,[12] and the record does not support a conclusion that her mentality in any way deprived her of a rational choice in the matter. If not asserted, the privilege is deemed to be waived.[13] Obviously, the principal purpose in calling appellant to testify was to permit the finder of fact to assess the validity of the testimony offered by the other witnesses concerning appellant's ability to care for her child.

The juvenile court concluded that it was in the child's best interest to terminate parental rights. P. L. L. had been in the same foster home for a period of almost five years at the time of the hearings. Testimony presented at trial indicates that the child is in an adoptable status and that it would be possible for the foster parents (and presumably others) to adopt her.

Notwithstanding our general reluctance to sever the natural parent-child relationship, the facts of this case require an af-

6. *State In Interest of R___ J___*, Utah, 589 P.2d 244 (1978) wherein we also held as follows: "Although courts are reluctant to perform social surgery in terminating the natural parent-child relationship, the welfare of the child is the paramount consideration."

7. Supra, footnote 4.

8. Supra, footnote 6.

9. As required by *In Interest of Walter B.*, Utah, 577 P.2d 119 (1978), citing *State v. Lance*, 23 Utah 2d 407, 464 P.2d 395 (1970).

10. *United States v. Roundtree*, 420 F.2d 845 (5th Cir. 1969); *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204 (8th Cir. 1973), cert. den., 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974).

11. *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977).

12. Appellant's counsel repeatedly raised the point at trial. Counsel can advise but cannot invoke the privilege. *State v. Anderson*, 27 Utah 276, 495 P.2d 804 (1972).

13. *United States v. Monia*, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943).

firmance of the juvenile court's decision. It is so ordered.

CROCKETT, C. J., and WILKINS and STEWART, JJ., concur.

MAUGHAN, J., dissents.