**STATE of Utah, in the Interest of P.H. and M.H., persons under eighteen years of age,**

v.

**Wanda HARRISON, aka Wanda Harrison Pennybaker, Appellant.**

No. 880691–CA.

Court of Appeals of Utah.

Nov. 21, 1989.

---

Quinn D. Hunsaker, Brigham City, for appellant.

Cheryl A. Russell, Logan, guardian ad litem.

R. Paul Van Dam, State Atty. Gen., Sandra L. Sjogren, Asst. Atty. Gen., for respondent, State of Utah.

Before GARFF, GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

Wanda Harrison appeals from a juvenile court order terminating her parental rights to P.H. and M.H. We affirm.

The juvenile court's findings have not been effectively challenged[1] and thus we derive the following facts from those findings, which were set forth in admirable detail. Because an understanding of the long history of this case is essential to our discussion, we likewise recite the facts and procedural history in detail.

---

1. Although Wanda asserts that the court's findings are not supported by the evidence, she has the burden to convince this court of her assertion. Her burden is a heavy one in that she "must marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be 'against the clear weight of the evidence,' thus making them 'clearly erroneous.'" *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989) (quoting *State v. Walker,* 743 P.2d 191, 193 (Utah 1987)). *See also Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985); *Harker v. Condominiums Forest Glen, Inc.,* 740 P.2d 1361, 1362 (Utah Ct.App.1987). This court applies the "clearly erroneous" standard when reviewing the factual findings in connection with juvenile court proceedings to terminate parental rights, *see, e.g., In re J.R.T.,* 750 P.2d 1234, 1236 (Utah Ct.App.1988), and while we may not have specifically addressed the duty to marshal in such cases, we see no reason why that duty should not apply. On the contrary, an appellant's marshaling of the evidence in support of challenged findings has become an integral aspect of "clearly erroneous" review in this state. Juvenile court proceedings should be no exception.

## FACTS

M.H. and P.H. were born in the state of Iowa to Wanda and Charles Harrison, in 1980 and 1982 respectively. Wanda and Charles divorced and Wanda moved with the children to Utah.

A petition alleging child neglect was filed with the First District Juvenile Court on October 4, 1985, seeking temporary custody and control of the children. The petition was based upon the following facts: The children were in a poor state of hygiene; the children were infected with head lice; P.H. complained of burns to the buttocks, which appeared to be cigarette burns; and there may have been possible physical abuse such as M.H. having his head forced into a toilet by a live-in boy friend. Although Wanda initially denied the allegations, she later admitted to them in answer to an amended petition. The children were placed in the temporary custody of the Division of Family Services ("DFS"), a treatment plan was submitted, and visitation was ordered.

Custody by DFS was continued until March 1986. During that time, the court ordered counseling for Wanda. Upon completion of the counseling, the children were returned to Wanda under the protective supervision of DFS.

From March 1986 to November 1986, Wanda retained custody of the children under the protective supervision of DFS. In June and September, Wanda was ordered to cooperate with in-home services being provided by DFS. An "added treatment" plan was also ordered during this time.

In November 1986, the children were again placed with DFS because Wanda had violated the terms of the "added treatment" plan. Another petition was then filed with the court alleging neglect by Wanda. Both Wanda and the children's father were served in conjunction with this petition.

In February 1987, a hearing was held on the petition. Charles failed to attend the hearing and a default judgment was entered against him. Wanda attended the hearing and admitted the allegations in the petition. Another treatment plan was submitted and Wanda was ordered to comply with its terms.

Temporary custody by DFS continued from February 1987 to November 1987. In August, another treatment plan for Wanda was presented and adopted by the court. At the same time, a guardian ad litem was appointed for the children.

In November 1987, yet another petition to terminate the parental rights of Wanda was filed with the court. Wanda's attorney moved for rescission of the treatment plan and return of the children. In January 1988, the court ordered the following: Documentation that Wanda had completed parenting classes and drug and alcohol counseling; an evaluation of Wanda's home; and a psychological evaluation to assess the stability of Wanda, the extent of her alcohol and drug dependency, and her ability to care for the children.

In April 1988, Wanda's motions for rescission of the treatment plan and return of the children were denied. Moreover, the court ordered Wanda not to tell the children in advance of her intended visits because she frequently failed to show up, thus upsetting the children. DFS was to arrange all future visits.

In June 1988, a trial began on the latest petition to terminate Wanda's parental rights. The trial lasted for a total of five days. During three days in June, the court heard the testimony of twenty witnesses. The trial was then continued until August.

On August 29, 1988, the court heard the testimony of three more witnesses, including two experts. At the conclusion of the proceedings on this date, the court expressed its intention to allow Wanda one more six-month period to overcome her deficiencies. It requested final argument to be submitted in writing, ordered Wanda into an alcohol treatment center, ordered visitation every Saturday from 10:00 a.m. to 3:00 p.m., and continued the trial until September 26, 1988.

When court reconvened on that date, Wanda failed to attend. Moreover, it was revealed that Wanda had not entered an alcohol treatment program and had fore-

gone several opportunities to visit her children. The court heard a few final comments from the attorneys, ordered one visitation before the issuance of its decision, and concluded the trial.

## TRIAL COURT DECISION

The court's findings of fact and conclusions of law were issued November 14, 1988. The court found that Wanda was unfit, substantially neglectful, or incompetent by reasons of her course of conduct, her alcohol and drug addiction, and her failure to respond to the help which had been offered. Furthermore, it found that such behavior was seriously detrimental to the welfare and health of the children. It recognized numerous attempts by DFS to help her overcome her problems, but noted that she had failed in each instance to do her part. Moreover, the court found it unlikely that the conditions would change in the near future and improbable that the children could be integrated back into a reasonable family life with Wanda. Consequently, it permanently terminated all of Wanda's parental rights in M.H. and P.H.

In arriving at its conclusion, the court emphasized several key facts. In regard to M.H., a seven-year-old boy, the court found a pervasive lack of care. When he was taken into custody the second time, he was small for his age. He wore ragged, size-3 clothes, shoes that were too small, and a lightweight coat despite the cold November weather. He had little hair on the crown of his head, had two burn scars on his right forearm, and lacked the appropriate immunizations. Moreover, M.H. had an epileptic condition which Wanda failed to treat although he was having between ten and twenty seizures a day. M.H. was unable to write his name and was otherwise scholastically behind children his same age. While in foster care for roughly half a year from November 1987 to June 1988, M.H. grew into size-8 clothes; received his immunizations; was treated for his epilepsy, which was largely brought under control; and was reading above his grade level.

P.H., a five-year-old girl, suffered from sleep problems when taken into custody the second time. She had fears of being left which took time to overcome. She had five or six round burn scars on her buttocks. While in foster care from November 1987 to June 1988, she grew from a size 2 to a size 7–8.

In regard to both children, the court found that the children were in substantial jeopardy of their health and welfare while in Wanda's custody. It also found that they had made great progress both physically and emotionally while in the custody of DFS.

The court found the following with respect to Wanda: A severe alcohol and/or drug addiction which she might eventually overcome, but only with long-term treatment; that she suffers from a personality disorder which affects her ability to care for her children and that she fails to recognize her responsibility for the health and well-being of her children; that she has a pattern of neglectful behavior, including allowing men with whom she has lived to physically abuse the children, a propensity to move frequently, a generally dirty and cluttered home, and a failure to secure meaningful employment sufficient to provide adequately for the children.

Although Wanda was given liberal visitation rights, she failed to visit on any regular basis and often failed to show up after having made specific appointments. Her failure to keep the appointments distressed the children. During 1987, she visited the children a total of only four times, not counting "visits" in conjunction with court appearances.

The court found that Wanda was repeatedly warned verbally and in writing that she was in danger of having her parental rights terminated. According to the court, she received legal counsel, hearings, treatment plans, alcohol and drug counseling, special help in homemaking assistance, in-patient help, supervised visits with the children, medical assistance, mental health counseling, psychological examinations, food, clothing, shelter, and other support. Still, she failed to follow through with any of the treatment plans either ordered or made available to her after September

1986. She failed to recognize her need for help with her alcoholism, her need to provide adequate housing for the children, and her need to improve her parenting skills.

On appeal, Wanda presents two arguments. First, amazing though it may be, she argues that the state failed to provide adequate assistance so that she could overcome her problems and regain custody of her children. Second, she argues that the court erred in its key conclusions, claiming the evidence demonstrated that she could be rehabilitated and did not support a finding of unfitness, substantial neglect, or incompetency.

## TERMINATION OF PARENTAL RIGHTS GENERALLY

■ Before addressing Wanda's specific arguments, we recognize that "[t]ermination of parental rights is a drastic remedy [and] should be resorted to only in extreme cases." *In re Winger*, 558 P.2d 1311, 1313 (Utah 1976). Two principles should guide courts and the state in making every effort to preserve the family relationship before resorting to this drastic remedy. First, there is a strong presumption that, in most instances, children are better off with their natural parents than with a foster or adopted family. *See In re Castillo*, 632 P.2d 855, 856–57 (Utah 1981). Second, but not unrelated, the Utah Constitution and the United States Constitution "[recognize] and [protect] the inherent right of a parent to maintain parental ties to his or her child...." *In re J.P.*, 648 P.2d 1364, 1377 (Utah 1982). *See also In re C.Y.*, 765 P.2d 251, 255 (Utah Ct.App.1988). Thus, every reasonable effort should be made to preserve the family unit.

However, all too frequently, there come to the state's attention parents whose own conduct has effectively destroyed the parent-child relationship and the state must remove the child from its environment if it determines that removal would be in the best interests of the child.[2] Moreover, when the relationship has been destroyed, "it is usually in the best interests of the child to terminate that relationship and allow the child an opportunity to establish a meaningful relationship with loving, responsible parents." *In re J.R.T.*, 750 P.2d 1234, 1238 (Utah Ct.App.1988). The Utah Supreme Court has recognized that

> children are entitled to the care of an adult who cares enough to provide the child with the opportunity to form psychological bonds, in addition to the physical necessities of life [and] [a]n unfit or incompetent parent is one who "substantially and repeatedly refuse[s] or fail[s] to render proper parental care and protection."

*In re K.S.*, 737 P.2d 170, 172–73 (Utah 1987) (quoting *In re S.J.*, 576 P.2d 1280, 1282 (Utah 1978)).

Utah Code Ann. § 78–3a–48 (1987) provides the mechanism by which the state may terminate the parent-child relationship when that relationship has already been destroyed by a parent's conduct. Section (1)(a) of the statute allows the state to terminate those rights if it finds by clear and convincing evidence[3] that the parent is "unfit or incompetent by reason of conduct or condition which is seriously detrimental to the child...." *Id.* In applying this statute, our Supreme Court has stated that the alleged "conduct or condition must be a 'substantial departure from the norm.' " *In re K.S.*, 737 P.2d at 172 (quoting *In re P.L.L.*, 597 P.2d 886, 888 (Utah 1979)). Ad-

---

**2.** In *In re J.P.*, 648 P.2d 1364 (Utah 1982), the Utah Supreme Court held that it was unconstitutional to rely *solely* upon a "best interests of the child" standard to terminate parental rights. However, in doing so, the Court stated that it "perceive[d] no incompatibility between [the parent's constitutional rights] and the principle that the child's welfare is the 'paramount consideration.' " *Id.* at 1377. Thus, without ignoring the parent's constitutional right, we continue to recognize that "the best interests of the child remains a principal consideration in de-

ciding whether to terminate parental rights." *In re J.R.T.*, 750 P.2d 1234, 1238 (Utah Ct.App. 1988).

**3.** The United States Supreme Court has determined that, at a minimum, the state must prove its case by clear and convincing evidence before it can terminate parental rights. *Santosky v. Kramer*, 455 U.S. 745, 768–69, 102 S.Ct. 1388, 1402–03, 71 L.Ed.2d 599 (1982). *Accord, In re J.R.T.*, 750 P.2d 1234, 1236 (Utah Ct.App.1988).

ditionally, the state must demonstrate that the parent "cannot or will not correct the evils which exist." *In re Walter B.*, 577 P.2d 119, 124 (Utah 1978). With these principles in mind, we examine Wanda's two arguments.

## PROPRIETY OF COURT'S FINDINGS AND CONCLUSIONS

█ Her second argument is easily resolved. The court in this case found that Wanda was "unfit, substantially neglectful or incompetent by reason of her course of conduct, the alcohol/drug addiction of Wanda Harrison and her failure to respond to help."

Wanda asserts the court's decision to terminate her parental rights was not supported by the evidence. However, "[t]he decision of a trial court to terminate parental rights will be disturbed on review only if the findings are clearly erroneous, i.e., if the findings are against the clear weight of the evidence." *In re J.R.T.*, 750 P.2d 1234, 1236 (Utah Ct.App.1988). Moreover, we defer to the juvenile court because of its "advantaged position with respect to the parties and the witnesses." *Robertson v. Hutchison*, 560 P.2d 1110, 1112 (Utah 1977).

Wanda not only failed to marshal the evidence in support of the court's findings and thereafter demonstrate its insufficiency, *see* note 1, *supra*, she failed to draw our attention to any evidence contrary to the court's findings.[4] We must accordingly "rely heavily on the presumption of correctness that attends these findings." *In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989). Moreover, our independent

inspection of the record persuades us that the evidence is more than adequate to support the trial court's findings. As those findings readily support the court's legal conclusions and decision, her second argument is without merit.

## "REQUIREMENT" OF STATE HELP

Wanda's first argument warrants a somewhat more detailed discussion. She argues that the state failed in its efforts to assist and rehabilitate her because she "suffered subtle psychological impairment that required extra assistance." In support of her position, she relies on *State v. Lance*, 23 Utah 2d 407, 464 P.2d 395 (1970), and the line of cases which were spawned by the following statement in that case.[5] In *Lance*, a majority of the Utah Supreme Court noticed a

> total lack of evidence that [the parent] was informed of the alleged inadequacies of the environment she was providing so that she might have an opportunity to improve these conditions. Since the species of her neglect involved rather subtle psychological factors ... justice require[d] that she be informed of the condition and be advised of appropriate remedial action.

464 P.2d at 399.

█ Subsequent to *Lance*, Utah courts have had several opportunities to examine and interpret the state's duty to notify the parent of his or her deficiencies and assist in rehabilitation. From these cases, it is clear that the state only has a duty when the reason for termination is parental unfitness.[6] *In re J.R.T.*, 750 P.2d 1234, 1237–38

---

4. In her brief, Wanda simply recited from various cases the applicable analyses under Utah Code Ann. § 78–3a–48(1)(a) (1987). She presented no evidence contrary to the court's findings. Moreover, she spent nearly two full pages discussing the standards for abandonment under § 78–3a–48(1)(b), even though the court did not rely on an abandonment theory in making its determination to terminate her parental rights.

5. In *In re M.A.V.*, 736 P.2d 1031 (Utah Ct.App. 1987), this court recognized that even this oft-quoted language from *Lance* was dicta. *Id.* at 1034 (citing *In re J.C.O.*, 734 P.2d 458, 463 (Utah

1987)). Moreover, we observed that the notion that *Lance* required notice and "reasonable efforts of assistance" as virtual conditions precedent to parental-rights termination originated as dicta in an opinion that did not have majority support. *Id.* at 1034 n. 3 (discussing *In re Walter B.*, 577 P.2d 119 (Utah 1978)).

6. In *In re E.*, 578 P.2d 831 (Utah 1978), the Utah Supreme Court seemed ready to expand this doctrine beyond the limited context of *Lance*. In *In re E.*, the Court applied the *Lance* requirements of notice and an opportunity to improve to a situation where the mother had failed to make support payments and the state had never

(Utah Ct.App.1988) (the state does not have a duty when the ground for termination is abandonment or physical abuse). Moreover, even if the allegation is unfitness, *Lance* does not "apply when children are physically endangered by abuse or neglect." *In re J.C.O.*, 734 P.2d 458, 463 (Utah 1987). The duty to assist "applies only to more exotic forms of abuse or neglect and certainly not to a consistent pattern of obvious physical abuse and neglect." *In re M.A.V.*, 736 P.2d 1031, 1034 (Utah Ct.App.1987). Finally, there is no duty of assistance when it is clear such efforts would be futile. *Id.* at 1035.

Unfitness was the ground for termination in this case, and Wanda claims that her situation involved an exotic form of neglect. We do not believe that the facts bear this out. In making her argument, Wanda focuses on her own psychological makeup and the interaction of her personality disorders with her alcoholism. What she fails to do, however, is further demonstrate that this condition resulted in a subtle form of *neglect*. The focus in *Lance* is not on the subtlety of the psychological condition but the subtlety of the abuse or neglect, and when obvious physical abuse or neglect exist, *Lance* does not apply. *See In re M.A.V.*, 736 P.2d at 1034. In the instant case, unlike *Lance*, the state demonstrated a long history of clear and obvious physical abuse and neglect and the court found that the children were in substantial jeopardy of their health and welfare while in the custody of the mother. Under these circumstances, we seriously question whether the state really has any legal duty to notify and assist the parent prior to commencing termination proceedings. *See id.*

But to the extent some *Lance*-type requirement is thought to apply, the state clearly fulfilled any obligation that it had. Even if before the state may terminate a person's parental rights, it must show that the parent's condition cannot be corrected after having been notified of the condition and given an opportunity to reform with reasonable assistance from the state, *In re Walter B.*, 577 P.2d 119, 124 (Utah 1978),[7] the state met that two-part duty.

## NOTICE

■ The crux of Wanda's argument really goes to the adequacy of the state's notice to her of the problems it perceived. Her claim is that DFS failed to identify the exact nature of her subtle psychological condition. Following Wanda's line of reasoning, she would require the state not only to identify the deficiencies in the individual's parenting ability and the apparent need for psychological assistance, but also to identify the exact psychological cause for that deficiency.

*Lance* and subsequent cases do not focus on the cause of the deficiency, but simply the existence of the deficiency itself. For example, in *Lance* the Court focused upon the state's failure to inform the parent of the "inadequacies of the environment she was providing...." *Lance*, 464 P.2d at 399. The Court was concerned with the condition and not the cause. As with the duty to assist, the standard for notification ought to be one of simple reasonableness. Courts should require reasonable notice of the deficiency and not of the technical cause for that deficiency. And "any notification of deficiencies, if and when required, need not be formal." *In re J.C.O.*, 734 P.2d 458, 463 (Utah 1987).

In this case, adequate notice of Wanda's deficiencies was given. The court found that Wanda was repeatedly warned verbally and in writing that she was in danger of having her parental rights terminated. Each time that Wanda's children were placed in protective custody, the petitions identified the specific reasons for removing the children, and each time, she *admitted* the critical allegations in the petitions. Moreover, numerous treatment plans were

---

informed her of the need to make payments. *Id.* at 836. The facts in *In re E.* had nothing to do with "subtle psychological factors" and we believe reliance on *Lance* was inapposite. Fortunately, later cases interpreting *Lance* have not employed the expansive reading of the *Lance* doctrine which was utilized in *In re E.*

7. *See* Note 5, *supra.*

drawn up for Wanda identifying Wanda's deficiencies and providing goals for her rehabilitation. These actions were more than adequate to notify Wanda of her deficiencies.

## ASSISTANCE

■ Having notified the parent of the deficiencies, the state arguably must provide reasonable assistance to remedy them. On the other hand, rehabilitative efforts are not required "where they would clearly be futile...." *In re M.A.V.*, 736 P.2d 1031, 1035 (Utah Ct.App.1987). In regard to the likelihood of rehabilitation, the state need not "show that the parent's conduct or condition is permanent, but only that the conduct or condition alleged to be seriously detrimental to the child cannot be corrected by reasonable efforts." *In re S.R.*, 735 P.2d 53, 57 (Utah 1987).

Utah courts have not defined what constitutes a reasonable effort to rehabilitate the parent. Importantly, however, they have recognized that rehabilitation is a two-way street which "requires commitment on the part of the parents, as well as the availability of services from the State." *In re J.C.O.*, 734 P.2d 458, 463 (Utah 1987). The parent must be willing to "acknowledge past deficiencies and [exhibit a] desire to improve as a parent and correct the abuses and neglect." *In re M.A.V.*, 736 P.2d at 1035 (Utah Ct.App.1987). "If after a reasonable period of time, no positive change[s] in parenting skills occur, a termination of parental rights is appropriate. Children cannot remain in limbo indefinitely where there is no reasonable likelihood of their parents gaining necessary parenting abilities." *In re C.Y.*, 765 P.2d 251, 255–56 (Utah Ct.App.1988).

Wanda argues that DFS's efforts at rehabilitation were superficial and inadequate. However, the record demonstrates incredible patience on the part of DFS in its attempts to rehabilitate Wanda. Moreover, the evidence suggests that Wanda lacked any real desire to improve as a parent and correct the abuses and neglect. If DFS's efforts in this case were inadequate, it is hard to envision efforts which would be adequate. DFS attempted to work with Wanda for more than three years before permanently terminating her parental rights. During that time, as the court found, she was provided legal counsel, numerous hearings, numerous treatment plans, help from alcohol and drug counselors, special help in the form of homemaking assistance, in-patient help, supervised visits with the children, medical assistance, mental health counseling, psychological examinations, food, clothing, and shelter. Indeed, if there was any error on the part of DFS and the juvenile court, it was in playing along for too long a time, unnecessarily delaying the inevitable and prolonging the misery of these children.

The final fact which defeats Wanda's contention is her own unwillingness to change. Basically, the court found that Wanda refused to commit herself to the rehabilitative efforts made by the state. She failed to complete all of the treatment plans designed to assist her. Nonetheless, at the conclusion of the proceedings on August 29, 1988, the court was still willing to afford Wanda one last opportunity for reform. It was not until she failed to enroll in an in-patient alcohol treatment center, failed to visit her children during the month of September, and failed to even attend the September hearing that the court was ultimately willing to grant the relief requested by the state.

## CONCLUSION

Especially in light of DFS's numerous attempts over a three-year period to rehabilitate Wanda and Wanda's obvious unwillingness or inability to reform, we affirm the court's decision to terminate Wanda's parental rights. Any other conclusion would place these children in a state of limbo indefinitely without any reasonable likelihood of her improvement.

GREENWOOD, J., concurs.

GARFF, Judge (concurring):

I write separately to emphasize the concern expressed in the main opinion, namely the inordinate amount of time it has taken

to conclude these proceedings. In October 1985, DFS filed the initial neglect petition in juvenile court, and three years later, in November 1988, the juvenile court entered its final findings of fact and decree. DFS placed the children in foster care in October 1985, returned the children to the mother in March 1986, placed them temporarily in a shelter home in November 1986, and then placed them in a more permanent foster home a few days later. Uncharacteristically, but fortunately for the children, they have remained in this home. for the past three years.[1] Reports indicate that the children have stabilized amazingly well in this home because both their physical and psychological needs have been attended to, and that they have bonded to their foster parents. Because the natural parents have been deprived of their parental rights, the children are now available for adoption. However, this portends an additional traumatic uprooting for the children unless the present foster home becomes an adoptive placement.

The main opinion quoted from *In re C.Y.*, 765 P.2d 251, 256 (Utah Ct.App.1988): "Children cannot remain in limbo indefinitely where there is no reasonable likelihood of their parents gaining necessary parenting abilities."[2] Since 1985, these children have been in limbo while waiting for their mother to translate her good intentions into changed behavior. The decision to cut all ties with biological parents who seriously neglect the physical and emotional needs of their children should be made with all deliberate speed. Protracted limbo status, with back and forth movement between parents and multiple foster care placements is extremely injurious to children.[3]

Although the best interest of the child is the "polar star" in dependency and neglect matters, the rights of parents must also be assiduously protected. However, once neglect has been established, the children's best interest must take priority over the parents' interests. Here the record is replete with evidence showing the mother's refusal to change her behavior in spite of repeated attempts by the State to assist her in these efforts. It is obvious that the focus was primarily on the mother's needs, but equally obvious she was not capable of change. Neglect was initially established in 1985, yet it took three years before the final decision was made to permanently separate parents and children. When parents do not quickly get their acts together, children should not continue to suffer. Yet two psychologists, who appeared to be totally oblivious to the history of the case and the repeated efforts to correct the causes of neglect over this protracted period of time, blithely continued to advocate further delay at the conclusion of the trial, recommending the same treatment previously attempted over the past three years. Their evaluations were devoid of any interest or concern for the needs of the children and merely catalogued, once again, the needs of the mother. At some reasonable point in time, for the sake of the children, the adults who are in control, whether they are psychologists, social workers, attorneys, or judges, must say, "Enough!" Children need a sense of belonging, continuity, and permanency. Such needs are

---

1. It is assumed that they have continued in this placement during the course of this appeal.

2. Websters Third New International Dictionary, 1312 (1986) defines limbo as "a place or state of neglect or oblivion." In medieval Latin, limbo was a region on the border of hell. It was the place for those who never had a chance, or for souls barred from heaven through no fault of their own.

3. Children, with their urgent need for security and stability, have their own sense of time. Children ... are not adults in miniature. They are beings per se, different from their elders in their mental nature, their functioning, their understanding of events, and their reactions to them....
Joseph Goldstein, Anna Freud, Albert Solnit, Beyond the Best Interests of the Child 2.13 (1973).
Consequently, they respond to any threat to their emotional security with fantastic anxieties, denial, or distortion of reality, reversal or displacement of feelings—reactions which are no help for coping, but rather put them at the mercy of events.
*Id.* at 2.12.

usually not satisfied in temporary care situations.

One further comment on the procedural delays: It is noted that after the petition for termination of parental rights was filed on November 13, 1987, it still took a year to reach a final conclusion. The trial on the petition commenced June 27, 1988, took five days, and was finally concluded on September 26, 1988. The decree was entered on November 14, 1988. These procedural delays, coupled with the "incredible patience" on the part of DFS in rehabilitating the mother, only served to increase the risk of additional emotional trauma to the children.

When the law intrudes, as it does in neglect proceedings, adult decision makers have an obligation to understand the urgency of these needs and to move the system toward their actualization as quickly as possible. It may be necessary to rearrange court calendars to permit the expeditious completion of a trial on consecutive days rather than extend it over a period of weeks or months. It may be necessary for caseworkers and prosecutors to face up to the reality, early-on, that emotional and environmental deficits make it virtually impossible for positive change to take place with some neglecting parents. And, it may be necessary for child care experts to recognize that what they perceive to be a logical treatment regime may not be possible with existing resources, coupled with the lack of motivation, desire or ability on the part of parents to cooperate with a given treatment plan.

Simply stated, time is of the essence in the lives of children such as M.H. and P.H. They cannot afford, emotionally, three years in limbo.