**STATE of Utah, in the Interest of E.D., C.D., C.D., and W.D., persons under eighteen years of age, Appellee,**

v.

**E.J.D. and B.D., Appellants.**

**No. 930012–CA.**

Court of Appeals of Utah.

May 19, 1994.

Rehearing Denied June 20, 1994.

Dean H. Becker, Salt Lake City, for appellants.

Jan Graham, Sandra L. Sjogren, and Carol L.C. Verdoia, Salt Lake City, for appellee.

Mark Stringer, Provo, guardian ad litem.

Before GREENWOOD, JACKSON and ORME, JJ.

## OPINION

GREENWOOD, Judge:

E.J.D. and B.D. (parents) appeal an order of the Fourth District Juvenile Court terminating their parental rights to their minor children E.D, C.D., C.S.D.,[1] and W.D. We affirm.

## FACTS

The four minor children involved in this termination of parental rights proceeding, E.D., C.D., C.S.D., and W.D., were born on June 11, 1983; January 9, 1985; September 16, 1986; and March 5, 1988; respectively. The three older children are girls; the youngest child, W.D., is a boy. In early January 1990, Donna Crawley, a licensed social worker and investigator with the De-

partment of Family Services (DFS), interviewed E.D. in response to reports of possible sexual abuse by her father, and arranged for a medical examination of E.D. at Primary Children's Hospital. DFS removed the three girls from their parents' house that same month and placed them with their maternal grandparents. On February 5, 1990, the girls were removed from their grandparents' home and placed in foster care. In July 1990, DFS formulated a treatment plan for the parents, including sexual abuse treatment for B.D., the father, through the Intermountain Sexual Abuse Treatment Center (ISAT), with the goal of reuniting the family by January 1991. Although the treatment plan did not require it, E.J.D., the mother, attended the therapy sessions at ISAT as well. As part of the rehabilitation of the family, DFS began a program of unsupervised weekend visits at approximately the same time.

On November 26, 1990, Kimberly Anderson, the DFS case worker for the three girls at that time, received a phone call from the three girls' foster mother, Ms. Jones. She expressed concern about the children's well-being, based on their changed behavior after returning from a visit with their parents over Thanksgiving. Ms. Jones called Ms. Anderson again the next day and said that C.D. had divulged to her some details of her experience during the Thanksgiving visit. Based on C.D.'s comments, Ms. Jones believed that DFS should formally investigate the matter. Ms. Anderson and Diane Warner Kearney, a child protection investigator with the State of Utah, visited the foster home the same day to interview the children. C.S.D. told Ms. Kearney and Ms. Anderson that her parents had both touched and penetrated her vagina "a lot of times" and that it "hurted." She also told them her parents had touched her younger brother, W.D. Ms. Kearney and Ms. Anderson also talked to E.D., who told them her parents had touched W.D.'s genitals with their hands and a spoon.

Based upon E.D.'s and C.S.D.'s descriptions of sexual abuse involving all four children, DFS removed W.D. from his parents'

---

1. We altered these initials to differentiate be- tween two minors with the same initials.

home and placed him with his sisters at the Joneses. DFS developed a new treatment plan in February 1991, requiring both the mother and father to obtain therapy at ISAT. The treatment plan permitted visitation with the children, but initially only with supervision. Again, the goal of the treatment plan was to reunite the family, this time by August 1991.

In May 1991, the parents, DFS, and the guardian ad litem for the children entered into a stipulation, approved by the juvenile court, for the reunification of the family by October 12, 1991. DFS thereafter instituted a third treatment plan, beginning in August 1991, to facilitate reunification of the family.

Pursuant to the stipulation's provision for regular visitation, the children spent the Labor Day weekend with their parents and grandmother on an unsupervised basis. Ms. Jones testified that the children were unusually quiet when she retrieved them after the visit. Later that day, when Ms. Jones's daughter gave C.D. and C.S.D. a bath, she observed that C.D.'s vagina was "really red and irritated" and alerted her mother.

When Ms. Jones questioned the children individually about the weekend visit, they told her consistent stories of sexual abuse involving the parents and grandmother. Based upon this information, Ms. Jones took E.D., C.D., and C.S.D. to Dr. Gary Behrman, a pediatrician, for an examination. Dr. Behrman first examined E.D. and found no abnormalities except that the perivaginal area was extremely red and that the opening to her vagina was larger than normal for an eight-year-old girl. Dr. Behrman testified that these abnormalities were consistent with physical stimulation and abuse. With respect to C.S.D., Dr. Behrman found perivaginal irritation and a "floppy vaginal opening." Finally, Dr. Behrman's examination of C.D. also revealed an irritated, red perivaginal area and an enlarged vaginal opening. The "floppiness" of the vaginal opening, stated Dr. Behrman, was more consistent with repeated penetration than a single incident and

the redness of the perivaginal area indicated recent injury or damage.

On September 4, 1991, Gayle Seal Blanchett, a therapist at ISAT, conducted corroborative [2] interviews of C.S.D. and W.D. at the request of Michael Handley, the four children's primary therapist at the time. Both children described actions by their parents involving inappropriate sexual interaction with the children, much of it entailing the use of kitchen utensils.

On September 5, 1991, E.D. and C.D. met with Andrew Handley, a therapist at ISAT. Both girls again stated that their parents had touched them inappropriately in the presence of their grandmother. Mr. Handley contacted DFS so that visitation could be suspended.

On September 25, 1991, Ms. Jones took the four children to Primary Children's Hospital for examination by Dr. Helen Britton, a pediatrician with expertise in the diagnosis of sexual abuse. The sole abnormalities discovered in E.D.'s examination were a significant scar indicating that some object had penetrated the labia and a "rectal tag" that is consistent with some type of injury to that area. C.S.D.'s examination was, in Dr. Britton's words, much more "remarkable." Dr. Britton found extensive scarring throughout the hymen indicating chronic penetration. C.S.D. also had two circular scars near the vaginal opening "that were just unusual in nature." Dr. Britton posited that the scars were caused by trauma with a sharp object. Finally, C.S.D. also had an abnormal vascular pattern, which again suggested she had experienced significant trauma in the perivaginal area. During C.D.'s examination, Dr. Britton found scarring probably resulting from penetrating trauma to the hymen. Dr. Britton testified that fingers could have caused the scarring, but not C.D.'s fingers. Finally, with respect to W.D.'s examination, Dr. Britton did not find any scarring of his penis, although she stated that scarring would not necessarily result from insertion of an object. The only abnormality noted during the exam-

---

**2.** Blanchett defined a corroborative interview as a special type of interview for children who may have been sexually abused. Generally the child's first interview, it is conducted in a sensitive and

careful manner. The interviewer is trained to avoid leading questions and permit the child to give information spontaneously.

ination was a small "W" shaped scar on his rectum; however, Dr. Britton was unable to draw any conclusions from this scar. Nevertheless, Dr. Britton concluded that all four examinations were consistent with sexual abuse.

On May 21, 1992, DFS filed a petition for termination of parental rights. A two-day trial took place beginning on August 24, 1992. The children were not present to testify at trial because their therapists stated it would be extremely detrimental to their mental health to relate at trial the stories of their sexual abuse. The therapists expressed concern that C.D. and C.S.D. would have to be hospitalized if forced to endure the trauma of a trial, and that E.D. would "deteriorate" and "go into dissociation." W.D. was extremely angry about continued questioning regarding his abuse and it was anticipated he would say very little if called to testify.

At trial, ten individuals—the foster mother, case workers, investigators, doctors and therapists—all testified that they believed the children had been sexually abused. There was also detailed medical testimony, as described earlier in this opinion, about the physical and psychological condition of each of the four children. On December 2, 1992, the trial court issued an order terminating E.J.D. and B.D.'s parental rights on the grounds of neglect and abusive treatment pursuant to Utah Code Ann. § 78–3f–107(2) (Supp.1993). The trial court denied the parents' request for reconsideration on January 13, 1993, but granted a stay of the termination order pending the resolution of this appeal.

The parents raise three issues on appeal: (1) Is the constitutional right to confrontation applicable in a parental rights termination proceeding? (2) Did the trial court fail to comply with Utah Code Ann. § 76–5–411 (1990), thereby erroneously admitting unreliable hearsay? and (3) Was the evidence adduced at trial sufficient to justify the trial court's determination granting the petition for termination of parental rights? [3]

## ANALYSIS

### Right to Confrontation

■ The trial court ruled that the four children were "unavailable" to testify based upon their therapists' statements that testifying would be extremely detrimental to their mental health and might even lead to hospitalization. The parents now claim, although they did not do so at trial, that this ruling violated their right to confront the witnesses against them under both the Sixth Amendment of the United States Constitution and article I, section 12 of the Utah Constitution.[4] The parents concede that this is not a criminal case and that they have discovered no authority extending the right to confrontation to a termination of parental rights proceeding. However, they argue that "in a very real sense [a]ppellants are defendants against the charge that they sexually abused their children and that finding by the Juvenile court brings upon them the punishment of losing their children."[5]

> The integrity of the family and the parents' inherent right and authority to rear their own children have been recognized as fundamental axioms of Anglo–American culture, presupposed by all our social, political, and legal institutions. "To protect the [individual] in his constitutionally guaranteed right to form and preserve the family is one of the basic principles for which organized government is established."

*In re J.P.*, 648 P.2d at 1373 (quoting *Lacher v. Venus*, 177 Wis. 558, 569, 188 N.W. 613, 617 (1922)). Juvenile court proceedings involving possible termination of parental rights, however, must also consider a counterpoise to the parents' fundamental right to raise their children—"the principle that the child's welfare is the 'paramount consideration.'" *Id.* at 1377. This consideration is not present, at least not to the same

---

3. The parents also included in their statement of issues that the court's findings of fact and conclusions of law were impermissibly vague. However, they evidently waived this issue as they do not refer to it in the body of their brief.

4. Both amendments, by their specific language, refer to "criminal prosecutions."

5. It is well established that the Utah Constitution and the United States Constitution " '[recognize] and [protect] the inherent right of a parent to maintain parental ties to his or her child.' " *State ex rel. P.H. v. Harrison*, 783 P.2d 565, 569 (Utah App.1989) (quoting *In re J.P.*, 648 P.2d 1364, 1377 (Utah 1982)); *accord State ex rel. D.W. III v. W.M.*, 856 P.2d 363, 367 (Utah App. 1993). As the Utah Supreme Court observed in *In re J.P.*,

The appellate courts of this state have consistently refused to address issues, even those implicating constitutional rights, that are raised for the first time on appeal. *State in re Schreuder,* 649 P.2d 19, 22 (Utah 1982); *State v. Sepulveda,* 842 P.2d 913, 917–18 (Utah App.1992). This principle applies equally to proceedings originating before the juvenile courts. *State in re M.S.,* 781 P.2d 1289, 1291 (Utah App.1989). In an "exceptional or extraordinary case" reviewing courts will consider a constitutional claim that was not raised before the trial court. *Id.* at 1291; *accord Sepulveda,* 842 P.2d at 917–18. However, the parents' failure to assert on appeal that the trial court committed plain error or that exceptional circumstances exist precludes our further consideration of this issue. *Sepulveda,* 842 P.2d at 917–18.[6]

### Applicability of Section 76-5-411

■ The parents contend that the trial court's failure to comply with the requirements of Utah Code Ann. § 76-5-411 (1990) is reversible error due to the admission of prejudicial, unreliable hearsay. This statute, contained in Utah's Criminal Code, requires the trial court to initially determine whether admission of out-of-court statements of a child victim will best serve "the interest of justice." *Id.* § 76-5-411(2). In making that determination, the court must consider "the age and maturity of the child, the nature and duration of the abuse, the relationship of the child to the offender, and the reliability of the assertion and of the child." *Id.*

Termination of parental rights proceedings are *civil* proceedings and are governed by the Utah Rules of Civil Procedure. Utah Code Ann. § 78-3f-106(3) (Supp.1993). In addition to the Utah Rules of Civil Procedure, the legislature has promulgated statutes specifically controlling termination of parental rights proceedings. *See id.* §§ 78-3f-101 to –114 (Supp.1993).

In contrast to these statutory provisions governing termination of parental rights proceedings, section 76-5-411 is part of the Criminal Code and clearly applies in the context of *criminal* proceedings. The parents have not presented any authority or legal analysis supporting application of this criminal provision to this civil proceeding. Accordingly, we decline to rule upon this issue. *See State v. Amicone,* 689 P.2d 1341, 1344 (Utah 1984). However, we note that even if section 76-5-411 applied to termination of parental rights proceedings, the trial court's alleged violation of section 76-5-411 in this case was harmless error due to the abundance of independent, objectively ascertained evidence concerning sexual abuse of the children. We further note that Rule 803(4) of the Utah Rules of Evidence permits physicians to testify regarding statements made to them for purposes of medical diagnosis or treatment as an exception to the hearsay rule.[7] Further, this hearsay exception has been extended to include similar statements made to psychiatrists and psychologists. *State v. Schreuder,* 726 P.2d 1215, 1224 (Utah 1986). Therefore, the children's statements to their physicians and qualifying therapists for diagnostic purposes would be admissible under Rule 803(4) as exceptions to the hearsay rule. These statements, in addition to the medical evidence of abuse, are more than sufficient to support the trial court's decision to terminate parental rights.

### Sufficiency of the Evidence

■ The parents' final assignment of error concerns the sufficiency of the evidence supporting the trial court's decision to terminate their parental rights. The parents contend first that it was improper for the court to consider testimony bearing upon the perceived credibility of the children, and second,

degree or manner, in criminal proceedings charging a parent with abuse of his or her child.

6. Our decision not to address this issue is further bolstered by the fact that the parents' argument has not been supported by analysis or legal authority. *State v. Amicone,* 689 P.2d 1341, 1344 (Utah 1984) (declining to rule on constitutional issue unsupported by legal analysis or authority).

7. The rule admits "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Utah R.Evid. 803(4).

that the medical evidence of sexual abuse was inconclusive.

Findings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous. *In re J.D.M.*, 808 P.2d 1122, 1124 (Utah App.1991); *State ex rel. M.S. v. Lochner*, 815 P.2d 1325, 1328 (Utah App.1991); *see also* Utah R.Civ.P. 52(a). In order to establish clear error and thereby merit reversal, an appellant " 'must marshall the evidence in support of the findings and then demonstrate that despite this evidence, the [juvenile] court's findings are so lacking in support as to be against the clear weight of the evidence.' " *In re J.D.M.*, 808 P.2d at 1124 (quoting *State ex rel. P.H. v. Harrison*, 783 P.2d 565, 566 n. 1 (Utah App. 1989)); *accord Lochner*, 815 P.2d at 1328.

The parents argue that the trial court improperly permitted the children's therapists, Dr. Warren Ike and Dr. Randall Frank Hyde, to testify that they believed the children were telling the truth about being sexually abused, based upon certain behavioral indicators such as dissociation, their responses when questioned about the alleged abuse, the specificity of the allegations, and their responses to the anatomically correct dolls.[8] The parents cite *State v. Rimmasch,* 775 P.2d 388 (Utah 1989) for the proposition that "there is no unanimity in the legal community as to the inherent reliability of a child sexual abuse profile to show that abuse has actually occurred with respect to a specific alleged victim." *Id.* at 400.[9] The State correctly points out that the parents failed to object to this testimony at trial and have therefore waived the issue. *State v. Steggell,* 660 P.2d 252, 254 (Utah 1983); *State v. Sepulveda,* 842 P.2d 913, 917–18 (Utah App. 1992); *State in re M.S.,* 781 P.2d 1289, 1291

(Utah App.1989). In addition, counsel for the parents *asked* three witnesses whether they thought the children were credible. Therefore, even if it were error to admit the testimony, it was "invited" error which is viewed with disfavor in Utah. *State v. Tillman,* 750 P.2d 546, 560–61 (Utah 1987). Finally, even if the parents are correct that testimony by Drs. Ike and Hyde was impermissibly admitted, they are unable to establish prejudicial error in light of the overwhelming evidence from other witnesses supporting the trial court's finding that the children were sexually abused.

The parents next argue that "[t]he medical experts upon whose testimony the court relied in determining that sexual abuse had taken place did not offer any evidence conclusive of sexual abuse and testimony that certain physical symptoms indicate sexual abuse lack the foundation to introduce those findings as scientifically reliable or valid." The parents do not, however, marshal the evidence with respect to this issue, do not state which testimony lacks foundation, and do not demonstrate that they objected to this testimony at trial for lack of foundation. Therefore, we do not address this argument.

## CONCLUSION

The majority of the issues raised by the parents are waived due to failure to make contemporaneous objections at the trial level and failure to comply with briefing standards on appeal. However, even if we were to rule in the parents' favor and exclude, where appropriate, testimony which may have violated the hearsay rule, the medical evidence alone supports the trial court's finding of sexual abuse with respect to at least two of the children.[10] Given this finding, the trial court

---

8. The parents also posit that Dr. Ike's testimony is inadmissible because he was not an expert witness and because one aspect of his testimony was allegedly "not rationally based upon his perception." However, counsel for the parents did not object to Dr. Ike's testimony on these bases at trial. Accordingly, the issues are waived. *State v. Steggell,* 660 P.2d 252, 254 (Utah 1983).

9. *Rimmasch,* a criminal case wherein the defendant was charged with forcible sexual abuse, rape, forcible sodomy, and incest involving his daughter, was not a civil termination of parental

rights case. *State v. Rimmasch,* 775 P.2d 388 (Utah 1989).

10. The parents conceded at oral argument that if the trial court correctly terminated parental rights to two of the children on the basis of sexual abuse, there was no error in acting similarly as to the other two children. *See* Utah Code Ann. § 78–3f–108(2)(g) (Supp.1993) (evidence of grounds for termination of parental rights may include "injury ... of a sibling of the child due to known or substantiated abuse or neglect by the parent or parents").

did not err in its decision to terminate parental rights with respect to all of the children. We affirm.[11]

JACKSON and ORME, JJ., concur.

11. We wish to register our concern that DFS delayed bringing termination proceedings for a period of over two years from the first evidence of sexual abuse of these children. During this time, it focused its energies on designing and implementing various treatment plans, the object of which was to preserve the parent-child relationship. Such a rehabilitative course by DFS was not legally necessary in this case, which involved physical abuse rather than some variety of parental unfitness. *See State ex rel. P.H. v. Harrison*, 783 P.2d 565, 570–71 (Utah App.1989). Nor was the resulting period of legal limbo in the children's interest. *See id.* at 572–74 (Garff, J., concurring). That limbo has been exacerbated by the appeal process, marked by significant briefing delays, and the trial court's stay of the termination order pending appeal, preventing efforts to arrange for adoption of the children.