In *State v. Brown,* 853 P.2d 851 (Utah 1992), the Utah Supreme Court clarified that issues raised for the first time on appeal would be addressed only if the trial court proceedings demonstrated "plain error." Plain error will be found only if the appellate court determines that (1) the error "should have been obvious to a trial court ... [; and (2)] the error must be harmful in that it affects the substantial rights of the accused." *Id.* The plain error exception acts as "a safety device to make certain that manifest injustice does not result from the failure to consider an issue on appeal." *State v. Archambeau,* 820 P.2d 920, 923 (Utah App.1991). *See also State v. Eldredge,* 773 P.2d 29, 35

GARFF and ORME, JJ., concur.

**STATE of Utah, in the Interest of: D., W., III, DOB: 8/24/87 and M., L., DOB: 3/27/89, Plaintiffs and Appellees,**

v.

**W.M. and C.D., Defendants and Appellants.**

**No. 920204–CA.**

Court of Appeals of Utah.

May 21, 1993.

---

Bruce M. Plenk and Silvia Pena Chacon, Salt Lake City, for defendants and appellants.

Jan Graham, Linda Luinstra, Carol L.C. Verdoia, and Ann L. Wasserman, Salt Lake City, for plaintiffs and appellees.

Before BILLINGS, GARFF and GREENWOOD, JJ.

## OPINION

GREENWOOD, Judge:

Appellant W.M. appeals the termination of his parental rights to his son, W.D., III, and daughter, L.M. Appellant C.D. appeals the termination of her parental rights to W.D., III. On the basis of parental unfitness due to conduct seriously detrimental to the children, Utah Code Ann. § 78–3a–48(1)(a) (1987), we affirm.

## FACTS

As of the date of trial, W.M. and C.D. had lived together as common law spouses for approximately ten years. During this time period, C.D. gave birth to three children. The first child, I.M., was born in California in December, 1984. The San Francisco Department of Social Services removed I.M. from C.D. at birth and placed her in emergency shelter care. The agency made attempts to reunify the parents and child from 1985 to 1987. These attempts failed, and on July 31, 1987, the couple's parental rights to I.M. were terminated.

C.D. became pregnant again in late 1986 or early 1987. C.D. and W.M. decided to move to Utah for the birth of the child because they thought Utah courts were more conservative in their approach to parental rights. The baby, W.D. III (W.D.), was born on August 24, 1987 at Holy Cross Hospital in Salt Lake City. Two days later, C.D. left the hospital without W.D. The trial court was unable to determine whether this was voluntary or because the hospital would not permit her to take the baby. A protective service referral was made by the Hospital to the Utah Division of Family Services (DFS), ultimately resulting in DFS's temporary custody of W.D.

The California Department of Social Services subsequently filed a petition alleging W.D. to be dependent and in need of supervision. W.D. was released from a Utah shelter to the custody of a San Francisco case worker. He was placed with extended family members in San Francisco, and on February 25, 1988, a California court declared W.D. a dependent child.

On June 2, 1988, W.D. was returned to Utah for courtesy supervision and out-of-home foster placement by DFS pursuant to the Interstate Compact on Placement of Children. Utah Code Ann. § 62A–4–301 to –309 (1989). DFS scheduled weekly supervised visits between the parents and W.D. from June 1988 to approximately April 1989. DFS discontinued the visits at that time, because the parents no longer requested them.

In October 1989, a review hearing was held in California (only W.M. was present) and the California agency directed that visits be discontinued. The reasons given by the agency for this decision were: stress of visits on the child; minimal sanitation of parents; refusal of parents to admit they had psychological problems; refusal to take medication; refusal to participate in therapy; refusal to participate in parenting skills classes; and refusal to sign Utah treatment plans.[1]

1. A "treatment plan" is created by a case worker as part of the process of reunifying parents and

In about mid–1988, C.D. became pregnant with the couple's third child. Because it was their experience that a hospital would not permit C.D. to return home with the baby, the two decided that W.M. would deliver the child himself at home. They sought no pre-natal care, and neither parent had any experience or training in home birth. The sole preparations for L.M.'s birth consisted of obtaining some hot water and hydrogen peroxide. Fortunately, the baby, L.M., was born without complications.

About five days after L.M.'s birth, the couple's attorney notified DFS of the infant's existence, and DFS workers, along with a Public Health representative, attempted to visit the apartment. They were turned away. On April 12, 1989, a police officer was called to the apartment on a disturbance call. Upon entering, she found there was no electricity in the apartment; a window was broken; the back door was kicked in; garbage was piled in the kitchen; roaches were on the floor, walls and ceiling; and food was rotting in the kitchen. C.D. entered the apartment with L.M. approximately 45 minutes later. L.M. was not wearing a diaper, and had mucous and fecal matter on her clothes. Her feet were a purple color from the cold, and she was hungry. The officer removed the child because she felt the premises were unsafe, and delivered her to the Youth Services Center.

DFS workers visited the apartment shortly thereafter, and found the toilet broken, the sink filled with dishes, and debris throughout the house. They found no clothing or food for L.M., and concluded that the premises were uninhabitable for the baby. DFS provided a house cleaning service for C.D. and W.M. beginning in April, 1989. On their first visit, workers noted that the apartment was filthy, infested with roaches, and had a bad odor. An after-birth was found in the garbage can. The apartment was ultimately condemned by the Board of Health.

Both C.D. and W.M. were hospitalized in the University of Utah psychiatric ward soon after the removal of L.M. The two have fairly similar backgrounds of sporadic hospitalization. C.D. was institutionalized at the Utah State Hospital in March 1991, and, at the time of trial, was not expected to leave any time in the near future. W.M. was again hospitalized on two occasions, in December 1989 and September 1991.

On August 15, 1989, a hearing was held in the juvenile court, at which C.D. and W.M. were present and represented by counsel. The court found that L.M. was neglected and placed her in temporary custody under the guardianship of DFS. The court required DFS to submit a treatment plan to the court, and set the matter for further court review.

DFS created a treatment plan aimed at reunifying the parents and L.M. for the time period between August 14, 1989 and January 5, 1991. This plan generally required C.D. and W.M. to obtain steady employment, maintain a clean and livable residence, take all prescribed medication, attend therapy, and participate in parenting classes. In six subsequent court reviews and two administrative reviews, it was noted that the parents completed none of the conditions of the treatment plan.

During this time period, C.D. and W.M. had weekly one-hour supervised visitation with L.M. Supervisors observed that C.D. lacked nurturing and parenting skills, and appeared nervous and hostile toward L.M. On one occasion C.D. threatened to kill L.M. Reports on W.M.'s behavior stated that he lacked the knowledge and skills to relate to the child. Dr. Leon Fred Soderquist, a licensed clinical social worker and resident in psychology, testified in the subsequent trial that if W.M. was coached during the visitation session, he was able to interact on a limited basis with L.M. However, Dr. Soderquist also testified that W.M. was unable to retain the skills taught

---

child. The plan creates several goals for the parents to achieve before DFS will return the child to their home. In this case, the goals included maintaining employment, maintaining

safe and clean housing, taking medication, attending therapy, and participating in parenting classes.

in any particular visitation session and "reverted back" to his earlier behavior patterns in a subsequent session.

C.D. voluntarily terminated her parental rights to L.M. on October 16, 1990. In a court report on the same date, a DFS worker commented on the negative impact of W.M.'s visits on L.M. and recommended their termination. On January 10, 1991, a second DFS worker submitted a report to the court recommending termination of visits between W.M. and L.M. on the basis that there was very little interaction between parent and child during the visits and L.M. appeared to be traumatized by them.

In April of 1991, trial was held on the State's petition to terminate W.M. and C.D.'s parental rights to W.D., and on a petition to terminate W.M.'s parental rights to L.M.[2] The State's witnesses included nine social workers and case workers, and two individuals with psychology and therapy backgrounds. After setting forth extensive and detailed findings of fact, the trial court concluded that W.M. and C.D. were unfit parents by reason of conduct or condition which is seriously detrimental to the children as provided in Utah Code Ann. § 78–3a–48(1)(a) (1987) and ordered the termination of their parental rights in both children.

## ISSUES AND STANDARD OF REVIEW

Appellants argue on appeal that the evidence relied upon by the juvenile court was not sufficient to establish that C.D. and W.M. were unfit parents under § 78–3a–48(1)(a) (1987). Findings of fact in a parental rights termination proceeding are only overturned if they are clearly erroneous. *M.S. v. Lochner*, 815 P.2d 1325, 1328 (Utah App.1991); Utah R.Civ.P. 52(a). To establish clear error and merit a reversal, an appellant must "marshall all the evidence supporting the challenged findings and then show that despite that evi-

**2.** As noted earlier, C.D.'s Petition for Voluntary Termination of Parental Rights to L.M. was granted on October 16, 1990.

**3.** In a parental rights termination proceeding, the State must prove its case by clear and con-

dence, the findings are clearly lacking in support." *Id.*

## ANALYSIS

The Utah Constitution and the United States Constitution " '[recognize] and [protect] the inherent right of a parent to maintain parental ties to his or her child.' " *P.H. v. Harrison*, 783 P.2d 565, 569 (Utah App.1989) (quoting *In re J.P.*, 648 P.2d 1364, 1377 (Utah 1982)). This recognition has created a "strong presumption" that children should remain with their natural parents rather than be placed in a foster or adoptive family. *Id.* Termination of parental rights "is a drastic remedy [that] should be resorted to only in extreme cases." *In re Winger*, 558 P.2d 1311, 1313 (Utah 1976).

When it has been shown by clear and convincing evidence that parents are "unfit ... or substantially neglectful," they can be permanently deprived of their parental rights. *In re J.P.*, 648 P.2d at 1377. In addition, the strong presumption that children should remain with their parents may be overcome if the parents' conduct "has effectively destroyed the parent-child relationship." *Harrison*, 783 P.2d at 569. In such cases " 'it is usually in the best interests of the child to terminate that relationship and allow the child an opportunity to establish a meaningful relationship with loving, responsible parents.' " *Id.* (quoting *J.R.T. v. Timperly*, 750 P.2d 1234, 1238 (Utah App.1988)).

In this case, the trial court relied upon Utah Code Ann. § 78–3a–48(1)(a) (1987) as the statutory basis for a termination of parental rights. This statute requires a showing by clear and convincing evidence[3] that the parent is "unfit or incompetent by reason of conduct or condition which is seriously detrimental to the child." *Id.* The Utah Supreme Court has

vincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 768–69, 102 S.Ct. 1388, 1402–03, 71 L.Ed.2d 599 (1982). *Accord, In re J.R.T.*, 750 P.2d at 1236.

interpreted this requirement to mean that "the parent's conduct or condition must be a 'substantial departure from the norm.'" *In re K.S.*, 737 P.2d 170, 172 (Utah 1987) (quoting *In re P.L.L.*, 597 P.2d 886, 888 (Utah 1979)).

▮ Appellants argue there was insufficient evidence to support the trial court's finding of unfitness based upon parental conduct.[4] They point out that the children were removed from their care soon after birth and claim that there has not been enough interaction between the parents and children to establish a pattern of seriously detrimental conduct. One instance of "bad housekeeping," appellants assert, does not depart substantially from the norm and should not serve as the basis for termination of parental rights.

The State responds that "conduct" includes much more than the alleged "two week lapse in housekeeping." There was testimony that C.D. was uninterested in the children, had no parenting skills, had an explosive temper, and was a constant threat to her children's safety. With respect to W.M., there was testimony from many sources regarding his complete lack of parenting skills. The testimony was unanimous that W.M. would never be able to raise children without constant supervision from DFS. Further, there was a great deal of testimony regarding W.M.'s inability to pay attention to the children in C.D.'s presence and his failure to attempt to protect them from C.D.'s outbursts. Although W.M. stated that he intended to maintain a separate household from C.D., he also said that he placed C.D.'s interests first and would continue a marriage relationship with her.

Furthermore, the record shows consistent failure by W.M. and C.D. to maintain appropriate and safe housing, attend parenting classes, and take prescribed medication. The evidence further indicates that the noted deficiencies were chronic rather than temporary or one-time problems and lacked any reasonable likelihood of being resolved in the future. In addition, after reviewing the testimony regarding visitation sessions, we find circumstances comparable to the facts in another Utah decision terminating rights. *In re Castillo*, 632 P.2d 855, 856 (Utah 1981). The *Castillo* court concluded, "it plainly appears that there is such a failure, or deficiency, in the parent-child relationship that the values inherent therein are almost entirely absent [and it is] clearly demonstrated that there is a lack of capacity to serve the purposes of parenthood." *Id.* at 857.

▮ Appellants next argue that even if they have exhibited problematic behavior in the past, they must be afforded the opportunity to correct it. *See J.C.O. v. Anderson*, 734 P.2d 458, 462–63 (Utah 1987). The State counters this argument in two ways. First, there is no requirement for rehabilitative efforts "where they would clearly be futile or where they would needlessly expose a child to a clear risk of further abuse." *State in Interest of M.A.V. v. Vargas*, 736 P.2d 1031 at 1035 (Utah App.1987). Second, the record is replete with testimony concerning the many efforts made by the State to reunify the family,[5] and the consistent failure of the parents to follow through with treatment plans designed to bring this about. As this court noted in *C.Y. v. Yates*, 765 P.2d 251, 255–56 (Utah App.1988), "If after a reasonable period of time, no positive change in

4. Appellants also challenge the trial court's finding that W.M. and C.D. were unfit due to the presence of a mental *condition* with seriously detrimental effects on the children. In particular, they allege that it was error to make any conclusions about mental illness in the absence of formal psychological evaluations. Moreover, appellants point out that the trial court erred in basing its findings in part upon their admission to a portion of the State's dependency petition for L.M. which described C.D. as a paranoid schizophrenic. The petition was subsequently amended by the State, and the parents only admitted that C.D. had emotional problems which had interfered with her ability to properly care for the child. We need not consider these issues, as we dispose of this appeal on other grounds.

5. These efforts spanned a period of three and one-half years and included creation of treatment plans, supervised visits with the children, mental health counseling, homemaking assistance, and parenting classes and education.

parenting skills occur, a termination of parental rights is appropriate. Children cannot remain in limbo indefinitely where there is no reasonable likelihood of their parents gaining necessary parenting abilities."

## CONCLUSION

Having found sufficient evidence of parental conduct indicating unfitness and having determined that additional opportunities to correct this behavior would be futile, we find no clear error in the trial court's termination of the parental rights of both W.M. and C.D. Accordingly, the order permanently terminating their parental rights is affirmed.

BILLINGS and GARFF, JJ., concur.