**STATE of Utah, in the Interest of J.L.W., a person under eighteen years of age.**

**M.J.G., Appellant.**

**No. 940164–CA.**

Court of Appeals of Utah.

July 27, 1995.

---

Scott L. Wiggins and Mark E. Arnold, Salt Lake City, for appellant.

Carol Verdoia and Jan Graham, Salt Lake City, for the State.

Kathleen M. Nelson, Salt Lake City, in the interest of J.L.W.

Before ORME, BENCH, and BILLINGS, JJ.

## OPINION

ORME, Presiding Judge:

M.J.G. appeals the order of the juvenile court terminating her parental rights in her daughter, J.L.W., with whom she has not had a meaningful relationship in many years. We affirm.

## FACTS

M.J.G. is the biological mother of J.L.W., who was born on August 17, 1980. The Utah State Division of Family Services (DFS) assumed temporary guardianship and custody of J.L.W. in August 1984, following an investigation that found J.L.W. had been sexually abused by M.J.G. and unknown third parties over approximately a two-year period.[1] DFS placed J.L.W. in foster care with G.S., who has been able to continue serving as her foster mother for the entire term of her DFS custody, which now approaches eleven years' duration. Between 1984 and 1986, DFS involved M.J.G. in a program of counseling and treatment plans, although early assistance efforts were hampered by M.J.G.'s frequent

---

1. For reasons not explained in the record before us, criminal charges were never brought against M.J.G. despite the seriousness of her offense.

moves. After this period of instability, however, M.J.G. complied with a 1985 treatment plan and participated in counseling.

On April 24, 1986, J.L.W.'s guardian ad litem filed a petition to terminate M.J.G.'s parental rights.[2] Following an evidentiary hearing on the petition some months later, the juvenile court entered its ruling on March 6, 1987.[3] The court concluded there was clear and convincing evidence of sexual abuse, but declined to terminate M.J.G.'s rights because of her attempts to put her life in order and comply with DFS treatment plans.[4] The court ordered continuation of temporary DFS custody, continued foster placement in G.S.'s home, and a treatment plan designed to reunite mother and child "at such time as the mother is ready and the child is able to cope with such reuniting without the fear of new trauma." M.J.G. participated in sexual abuse counseling for approximately two years thereafter, and complied with subsequent treatment plans.

Between August 1987 and August 1988, the juvenile court reviewed the case every few months. In January 1988, the court heard testimony that past visitations with M.J.G. had a detrimental effect upon J.L.W. The court modified the visitation schedule, with the proviso that it would terminate visitation if J.L.W. exhibited further trauma from contact with her mother. Following testimony by therapists on the continuing effects of the visits upon J.L.W., the court suspended all visitation in May, pending further review. At its August 1988 review, the court awarded guardianship to G.S. and ordered that visitation by M.J.G. could only be resumed at J.L.W.'s request.[5]

The court reviewed the case eight times between August 1989 and May 1993. At the May 1993 review, the court ordered a psychological evaluation of J.L.W. to assess the effect of prior visitation with M.J.G. and evaluate her probable response to future visitation. Dr. Kimberly Walsh of the McKay–Dee Institute for Behavioral Medicine performed an evaluation the following August, finding, inter alia, that J.L.W.

> is a very fragile individual. Although she is stabilized now, she appears to have tremendous issues of unresolved anger, sadness, and an underlying thought disorder. Were she to be forced to resume contact with her biological mother, this fragile sense of psychological equilibrium would be disrupted, and there would likely be a return to the previous pattern of regression and destabilization that occurred when she previously had contacts with her biological family.

The State filed a second petition to terminate M.J.G.'s parental rights on November 2, 1993, at which time J.L.W., who had first been placed in foster care at age four, was thirteen years old. The juvenile court held a trial on January 13, 1994, and issued its

---

2. The petition also sought to terminate the parental rights of J.L.W.'s father, L.W., who is not a party to this appeal. After he failed to appear at the petition hearing, the juvenile court terminated his rights by default.

3. To illustrate the unacceptable delay in bringing J.L.W.'s status to a final conclusion, we note that it was in March of 1987 that this court, then recently established, heard its first oral arguments.

4. In conjunction with the court's decision not to terminate M.J.G.'s rights, it made the following pertinent conclusions of law:

4. [The] interests of the parent must be gauged by attempts to better oneself by therapy, in pursuing therapeutic goals and the social changes brought about by the parent in attempting to put herself and her life in order to have the child returned to her.

5. That since the acts of the abuse were last detected as late as May of 1984, the mother has stabilized herself and has fit properly into a scheme of therapy as supervised by the Division of Family Services and is progressing well within this plan.

6. That the reuniting of the child and the parent may be years away even if this progress is continued. The mother will have to accept the reality that the child is not willing to return to instability and abuse and such an environment would most likely destroy the child, even though the environment has improved substantially for the mother.

5. G.S. testified that J.L.W. had been admitted to Primary Children's Medical Center in June or July of 1988 to determine her emotional state regarding visitation with her mother. On that occasion, she had her last visit with M.J.G.

memorandum decision on February 22.[6] The court ordered termination of M.J.G.'s parental rights and directed DFS to "proceed with a permanent plan in the best interest of this child." It is contemplated that such a plan will have, as a primary ingredient, J.L.W.'s adoption by her foster mother of eleven years.

M.J.G. appeals from this order.

## ISSUES

This case presents two issues for our review: (1) whether the State has a duty, prior to terminating parental rights, to offer remedial or rehabilitative services to parents who have sexually abused their children; and (2) whether the rule is different due to the passage of time and/or any failures or oversights on the part of the State.

## STATE'S DUTY

■■■ M.J.G. contends that the State, prior to terminating her rights, was obligated to provide her with reasonable assistance in correcting the cause of her parental unfitness.

■■■ First, despite M.J.G.'s claim that inconsistency pervades the existing law pertaining to the State's duty to assist problem parents, the law in this area is very clear: The State owes no duty to offer rehabilitative services to parents in cases of obvious physical abuse, neglect, or abandonment.[7] *See*

---

**6.** The juvenile court entered detailed factual findings, including the following:

12. That the mother loves [J.L.W.] but the court finds she is rejecting the continual evaluations of the child's fragile mental condition, which condition has stabilized but not progressed sufficiently in the last years. She does not understand her daughter's desperate need not to have any contact with her. . . .

13. The court further finds that the mother has struggled and tried to help herself and keep up her desires to have the child returned to her. This desire has been demonstrated by her concern over her child and her own voluntary submission to counseling, in an attempt to try and understand her own dilemma.

. . . .

15. That the mother is unable[,] together with therapists, social workers, and the foster parent[,] to overcome or remedy the results of the child's abuse. The care givers to this child have been[,] as the mother[,] incompetent in their own actions[ ] to remedy the reasons for her placement away from the parent. Time, therapy and challenges to change have been attempted over this long period of time and nothing has succeeded.

The court concluded, in part,

that there is no likelihood in the foreseeable future for the child to beneficially recuperate from the trauma that brought about her placement in foster care. . . . [T]he mother[,] although meaning well[,] does not have the ability to remedy the resulting circumstances of a long ago abuse.

. . . .

3. The termination of the parent['s] rights are not to be put off with the wishful hope that things will soon change. They will not change and may never change. . . .

**7.** The concurring opinion suggests that the focus should be on the destruction of the parent-child relationship as the determinative factor relieving the State of its duty to assist. Such analysis,

while intellectually intriguing, is not, as the opinion recognizes, an established component of the doctrine announced in prior cases and binding upon us under the doctrine of stare decisis. *See, e.g., J.C.O. v. Anderson*, 734 P.2d 458, 463 (Utah 1987) (holding that any requirement to notify parents of deficiencies does not apply to children "physically endangered by abuse or neglect"; nothing said about separate focus on impact on parent-child relationship); *State ex rel. J.R.T. v. Timperly*, 750 P.2d 1234, 1237 (Utah App.1988) ("in cases involving circumstances over which the parent has control, such as abandonment or physical abuse, the state does not have a comparable duty to assist"; no discussion of separate requirement that parent-child relationship be affected); *State ex rel. M.A.V. v. Vargas*, 736 P.2d 1031, 1034 (Utah App.1987) ("the *Lance* requirement of particularized notice and efforts at 'remedial action' prior to commencement of termination proceedings applies only to more exotic forms of abuse or neglect and certainly not to a consistent pattern of obvious physical abuse and neglect"; no suggestion that pattern of abuse be shown to have any particular effect on parent-child relationship); *State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993) (stare decisis has equal application to decisions rendered by different panels of multi-panel appellate court). *See also infra* note 8.

The concurring opinion points out that the recently enacted Child Welfare Reform Act has no applicability to this case, and suggests that the outcome might be different if it did. Even if the Act were applicable, it is far from clear that the State would have a duty to provide rehabilitative services in cases of severe, prolonged physical abuse or neglect. For example, Utah Code Ann. § 78-3a-311 states, in part, that

the Legislature finds that a parent's interest in receiving reunification services is limited. The court may, under any circumstances, determine that efforts to reunify a child with his

*J.C.O. v. Anderson,* 734 P.2d 458, 463 (Utah 1987); *State ex rel. W.D., III v. W.M.,* 856 P.2d 363, 368 (Utah App.1993); *State ex rel. P.H. v. Harrison,* 783 P.2d 565, 570–71 (Utah App.1989); *State ex rel. J.R.T. v. Timperly,* 750 P.2d 1234, 1237 (Utah App.1988); *State ex rel. M.A.V. v. Vargas,* 736 P.2d 1031, 1034 (Utah App.1987). The duty to notify the parent of his or her deficiencies and offer assistance arises only in a narrow range of cases involving subtle forms of neglect or abuse, i.e., patterns of unintended behavior that create an inadequate environment for the child, such as by interfering with the

child's education or social development. *Anderson,* 734 P.2d at 463; *State v. Lance,* 23 Utah 2d 407, 413, 464 P.2d 395, 399 (1970).[8]

■ Moreover, even in the narrow range of subtle abuse cases where a duty to help may arise, there is no duty to offer rehabilitative services in those cases where such services would be futile or could expose a child to harm. *State ex rel. W.D., III,* 856 P.2d at 368; *Harrison,* 783 P.2d at 571. This exception is not, as M.L.G. maintains, inconsistent with our past opinions on the duty to assist.[9] Rather, the futility/harm exception

family are not reasonable, based on the individual circumstances, and that reunification services need not be provided. In any case, reunification services need not be provided to a parent if the court finds, by clear and convincing evidence, that any of the following circumstances exist:

. . . . .

(e) the minor is under the age of five and has suffered severe abuse by the parent or by any person known by the parent, if the parent knew or reasonably should have known that the person was abusing the minor;

(f) the minor has been adjudicated an abused child as a result of severe abuse by the parent, and the court finds that it would not benefit *the child* to pursue reunification services with the offending parent.

Utah Code Ann. § 78–3a–311(3)(e), (f) (Supp. 1994) (emphasis added). *See also* Utah Code Ann. § 62A–4a–203(3) (Supp.1994) (services designed to help family remain intact not reasonable, and therefore not required, if child's welfare endangered in home and placement in other care is only alternative); *id.* § 62A–4a–202(1)(a) (preventative services must be provided, but only "if the child's welfare is not immediately endangered and . . . it is possible and appropriate").

8. The Utah Supreme Court later declared that the statement defining this duty, as it appeared in *State v. Lance,* 23 Utah 2d 407, 413, 464 P.2d 395, 399 (1970), was dicta and has declined to expand its applicability to any more obvious forms of abuse or neglect. *J.C.O. v. Anderson,* 734 P.2d 458, 463 (Utah 1987).

Without knowing the Court's rationale in *Lance,* one may speculate that it reasoned subtle psychological abuse may be relatively easy to correct through education and training. It may also have thought that the more subtle forms of abuse or neglect are inadvertent or the product of poor parenting skills, perpetrated by well-meaning but ignorant parents, who would be anxious to change their ways if given a little guidance or support. In contrast, once a child has been subjected to physical abuse, remedial assistance to the parent responsible for the con-

duct is less likely to undo the harm to the child. Such abuse is also more culpable on the part of the parent and more likely to be the product of a violent or sadistic nature than of the mere lack of parenting skills.

Additionally, in identifying the subtle kind of abuse that triggers the State's duty to lend assistance to the parent, the focus is not on whether subtle psychological factors *prompted* the abuse, but instead on the subtle nature of the abuse itself. *See State ex rel. P.H. v. Harrison,* 783 P.2d 565, 571 (Utah App.1989). M.J.G. undisputedly had a traumatic childhood which may well have induced her aberrant behavior toward her own daughter, but such facts do not change the obvious nature of the abuse inflicted upon J.L.W.

9. M.J.G. mistakenly attempts to place all cases involving parental "unfitness" under the purview of the State's duty to assist. *See State ex rel. J.R.T. v. Timperly,* 750 P.2d 1234, 1238 (Utah 1988) (stating duty to assist is triggered if defendant's rights terminated based on unfitness rather than abandonment). Of course, unfitness, by itself, does not trigger the State's duty to notify parents of their deficiencies and offer remedial services. Egregious physical abuse is a result of one form of parental unfitness. Only unfitness in the context of the limited, subtle abuse specified in *Lance* implicates the State's duty to help.

Additionally, M.J.G. misconstrues the court's occasional focus on "control" as a means to define situations in which the State has no duty to offer assistance. *See Timperly,* 750 P.2d at 1237–38. Simply put, physical abuse, obvious neglect, and abandonment require the parent to act in an affirmative manner—to engage in conduct over which he or she has control. Whether or not, as a psycho-behavioral matter, the parent is actually able to exercise control over these actions is not the question. In contrast, the subtle abuse discussed in *Lance* occurs in situations over which parents have no control. For example, the mother in *Lance* was impoverished, unable to stay in one place, and thus ended up moving very frequently. 464 P.2d at 396–97. As a result, her children suffered emotional distress

acts as a second prong in a two-part test to assess the necessity of rehabilitative assistance in the cases of subtle abuse of the sort discussed in *Lance*. In other words, even if the abuse involved was of a subtle, psychological nature rather than physical, there is no duty to offer rehabilitative services if such assistance is not likely to correct the situation or if innocent children would continue to be exposed to harm while the parent attempts to rehabilitate.

In the instant case, there is extensive, reliable testimony documenting a pattern of sexual abuse extending over a period of approximately two years, inflicted by M.J.G. and unidentified third parties, during J.L.W.'s early childhood. Such a prolonged pattern of egregious physical abuse is precisely the type of conduct for which the State has *no* duty to offer rehabilitative services.[10] M.J.G. did receive counseling and assistance after DFS assumed custody of J.L.W. in 1984, and received additional counseling after the court denied the first termination petition in 1987. Whatever services M.J.G. has received have been gratuitously provided by the State. The fact that the State has failed to follow up with additional services in the last five or six years, or might have offered better or more consistent services in the early going, is of no legal significance whatsoever.

## ESTOPPEL

■ M.J.G. contends that even if the State initially lacked any duty to offer assistance in this case, the fact that the State nonetheless initiated such assistance and then failed to offer further assistance or attempt to reunite the family within the past seven years, estops

the State from terminating her rights without now offering meaningful assistance.

■ Ordinarily, a party wishing to raise a claim of estoppel must prove three elements: (1) that the other party made claims inconsistent with earlier actions or statements; (2) that the complaining party reasonably relied on the other party's prior actions or statements; and (3) as a result, the complaining party was harmed by the other party's later inconsistent claims. *United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880, 891 (Utah 1993). *See Warren v. Provo City Corp.*, 838 P.2d 1125, 1130 n. 16 (Utah 1992).

■ In the instant case, the court's ultimate termination of M.J.G.'s parental rights was not inconsistent with its prior claims or statements. Although the juvenile court did not terminate her rights in 1987 pursuant to the first termination petition, it also did not promise that reunification of the family was imminent or even probable. On the contrary, the court found

> that a reuniting of the child with the parent at the present time and in the foreseeable future would be difficult, that any establishment of any visitation should only commence when the child's maturity level is such that the child could cope with said visitation and the commencement of the reuniting with the mother.

Admittedly, the State allowed an extraordinarily long time to pass before filing the second petition in 1993, but such delay is not inconsistent with the court's 1987 decision denying termination in the hope that time and maturity would cure J.L.W.'s trauma vis-a-vis any relationship with M.J.G.[11]

---

from the ensuing instability, although the mother kept them clean and otherwise well cared-for. *Id.* at 397. Her housing situation was out of her control, but could be remedied with assistance in procuring subsidized housing or comparable programs. Similarly, in *In re Walter B.*, 577 P.2d 119 (Utah 1978), the mother did not have the existing ability to adequately deal with her hyperactive son, a situation not in her control but relatively easy to remedy through training. *Id.* at 121.

10. Because the abuse in this case was of an obvious, physical nature, it is not necessary to weigh the futility of providing additional ser-

vices. Nonetheless, the state of J.L.W.'s mental and emotional health, the lack of a mother-child bond, and the simple fact that J.L.W. is now almost fifteen, all make clear that further rehabilitative services for M.J.G. would have no positive effect on the unfortunate state of their relationship.

11. Moreover, the guardian ad litem has joined in the petition. Even if the State were somehow estopped, neither the guardian ad litem, nor the child, nor the child's foster mother/legal guardian could be estopped from asserting their claims because of inconsistency on the State's part. *See*

■ Perhaps more importantly, it is inappropriate to consider application of so-called equitable doctrines or those which promote mere judicial efficiency at the expense of a child's welfare.[12] It is extremely unfortunate that the State has allowed this case to linger for eleven years.[13] However, the State's ill-advised actions cannot preclude the inevitable disposition of this case—a disposition that will allow J.L.W. to escape the legal limbo she has been in for essentially her entire life. "At some reasonable point in time, for the sake of the children, the adults who are in control ... must say, 'Enough!'" *State ex rel. P.H. v. Harrison,* 783 P.2d 565, 573 (Utah App.1989) (Garff, J., concurring).

## CONCLUSION

Because of the nature of the abuse involved, the State had no duty to offer rehabilitative assistance to M.J.G. prior to terminating her parental rights. Any assistance M.J.G. did receive was gratuitously offered by the State and cannot be relied upon by M.J.G. to enhance her legal position at J.L.W.'s expense. Further, the extended period of time between the State's active efforts to reunify the family and the final phase of the termination proceedings does not create additional obligations upon the State regarding M.J.G. Accordingly, the juvenile court's decision to terminate M.J.G.'s parental rights was not erroneous and is therefore affirmed.

BENCH, Judge (concurring specially):

I concur. I write separately to express my concern over the black letter rule, as stated by the main opinion, that the "State has no duty to offer rehabilitative services to parents in cases of obvious physical abuse, neglect, or abandonment." I also write separately to observe that subsequent to the facts

giving rise to this case, the Legislature changed the law in this area when it enacted the Child Welfare Reform Act. *See* Utah Code Ann. §§ 62A–4a–101 to –709 (1994).

The main opinion concludes, consistent with case law from this court and the supreme court, that where "obvious physical abuse, neglect, or abandonment" are involved, the State has no duty to try to rehabilitate the offending parent or parents. *See J.C.O. v. Anderson,* 734 P.2d 458, 463 (Utah 1987); *State ex rel. W.D., III v. W.M.,* 856 P.2d 363, 368 (Utah App.1993); *State ex rel. J.R.T. v. Timperly,* 750 P.2d 1234, 1237 (Utah App.1988); *State ex rel. M.A.V. v. Vargas,* 736 P.2d 1031, 1034 (Utah App.1987). While we are bound by stare decisis, I am concerned that a rigid application of this rule runs the risk of denying services to parents who might respond positively to such treatment in a manner that would allow the family unit to remain intact.

The State always has a duty to provide treatment to the child in situations involving abuse or neglect. The only question is the extent to which the parent or parents will be involved in the child's treatment program.

The initiation of any treatment program begins with the presumption that the family unit should be kept together.

Two principles should guide the courts and the state in making every effort to preserve the family relationship before resorting to [termination of parental rights]. First, there is a strong presumption that, in most instances, children are better off with their natural parents than with a foster or adopted family.... Second, but not unrelated, the Utah Constitution and the United States Constitution "[recognize] and [protect] the inherent right of a parent

*Dansie v. Anderson Lumber Co.,* 878 P.2d 1155, 1159 n. 10 (Utah App.1994).

**12.** This court has previously held that the doctrine of res judicata should not be applied to cases which involve the best interests of children. *See Larson v. Larson,* 888 P.2d 719, 722 n. 2 (Utah App.1994); *In re J.J.T.,* 877 P.2d 161, 163–65 (Utah App.1994).

**13.** The Legislature has recognized the need to adjudicate such cases with reasonable dispatch

by its passage of the Child Welfare Reform Act, Utah Code Ann. §§ 62A–4a–101 to –709 (Supp. 1994), and related statutes, *id.* §§ 78–3a–301 to –315, –401 to –414. Under this new legislation, there are specific time lines established to prevent a child from languishing indefinitely in foster care. *See, e.g., id.* § 78–3a–312(1) (requiring dispositional review hearing no more than 18 months after child placed in out-of-home care); *id.* § 62A–4a–205(6)(b) (requiring treatment plans to have specific time frames for compliance).

to maintain parental ties to his or her child...." *Thus, every reasonable effort should be made to preserve the family unit.*

*State in Interest of P.H. v. Harrison*, 783 P.2d 565, 569 (Utah App.1989) (citations omitted) (emphasis added). Therefore, if a treatment program can reasonably preserve the family unit, I believe the State has a duty to provide such treatment.

This duty should be extinguished not by the type of abuse or neglect involved, but by the destruction of the parent-child relationship and the impossibility of maintaining the family unit as a result of the abuse.

[A]ll too frequently, there come to the state's attention parents whose own conduct has effectively destroyed the parent-child relationship and the state must remove the child from its environment if it determines that removal would be in the best interests of the child. Moreover, when the relationship has been destroyed, "it is usually in the best interests of the child to terminate that relationship and allow the child an opportunity to establish a meaningful relationship with loving, responsible parents."

*Harrison*, 783 P.2d at 569 (quoting *In re J.R.T.*, 750 P.2d 1234, 1238 (Utah App.1988)) (footnote omitted).

In most cases, there will probably be a correlation between (1) the seriousness of the abuse or neglect and (2) the destruction of the parent-child relationship. However, it should be the latter consideration, and not the former, that relieves the State of its duty to include the parent or parents in the child's treatment program.

In this case, the juvenile court terminated M.J.G.'s parental rights not because of the type of abuse involved, but because her relationship with J.L.W. had been destroyed and reunification was impossible. The juvenile court apparently believed that the State had some duty to provide treatment to M.J.G., but that the treatment was ineffective because of the destruction of the parent-child relationship. The juvenile court found, in pertinent part:

6. That this court has held periodic reviews since 1987 to determine if the child has progressed to a level[ ] where there could be a reintroduction of the child with the mother. That the child's condition has improved and regressed over the years as attempts were made to evaluate the child's progress. This child has not progressed significantly because of her mental and emotional condition to permit any contact.

. . . .

8. That the court has found that from 1987 to the filing of the petition to terminate that it would be in the best interest of the child that the child remain in foster care in the home of [her foster parents] where said child has been cared for and dealt with through a variety of crises of both personal problems and aggressive contacts with other children. That the child has not had contact with the mother since approximately June of 1988. That the child has been counseled by several therapists and evaluated by the specialists of the Primary Children's Hospital. The child was evaluated to be in a fragile mental state which would not permit her to have contact with the mother because of the feared regressive effect the contact would have upon the child.

. . . .

10. That her stabilization under the eye of the long-time foster parent has been difficult to attain but that she is presently able to control herself better and has developed her own feelings of self worth and confidence.

11. That the child has a continuing desire to not be reunited with her mother and that she has a desire to be adopted in her present long-term placement. Her needs are for a permanency and conclusion to her legal problems.

12. That the mother loves [J.L.W.] but the court finds she is rejecting the continual evaluations of the child's fragile mental condition, which condition has stabilized but not progressed sufficiently in the last years.[1] *She does not understand her*

---

**1.** The trial court incorporated portions of J.L.W.'s psychological evaluations in finding 9:

9. That the child was evaluated by Dr. Kimberly Walsh, a licensed psychologist, of the

*daughter's desperate need to not have any contact with her.*

. . . .

16. The child's conception of her own best interest over this period of time has not changed as she has an unalterable desire to not return to that place where she was harmed. . . . She continues to fear and recognize her mother as a source of her instability and past abuse.

(Emphasis added.) The court concluded that the parent-child relationship had been destroyed and that there was no possibility of reuniting M.J.G. and J.L.W. Based on its findings and conclusions, the trial court terminated M.J.G.'s parental rights over J.L.W.

I actually would prefer to follow the approach taken by the juvenile court and to hold that the State's duty to M.J.G. was extinguished by the destruction of the parent-child relationship. As stated by the main

opinion, however, existing case law holds that irrespective of the destruction of the parent-child relationship, M.J.G. was entitled to no opportunity to be reunited with J.L.W. because of the presence of "obvious abuse."

The Legislature subsequently altered the law in this area when it enacted the Child Welfare Reform Act. *See* Utah Code Ann. §§ 62A–4a–101 to –709 (1994). Cases arising from facts occurring after the Act may very well be decided differently.

BILLINGS, J., concurs in the concurring opinion of Judge BENCH.

McKay–Dee Institute for Behavioral Medicine. That the same psychologist evaluated the child on August 8 and August 12, 1993, and reviewed prior reports of both evaluators, therapists, and social workers and concluded, as follows:

A. "The results of the psychological evaluation suggests that [J.L.W.] is a very fragile individual. Although she has stabilized now, she appears to have tremendous issues of unresolved anger, sadness, and an underlying thought disorder. Were she forced to resume contact with her biological mother, this fragile sense of psychological equilibrium would be disrupted, and there would likely be a return to the previous pattern of regression and destabilization that occurred when she previously had contacts with her biological family. It is my conclusion that the reason [J.L.W.'s] adjustment is so stable right now, is that she is in a comfortable, familiar, secure, and structured

environment in the [foster] home. Were she forced to reestablish contact with her biological family, and the previous issues of her past abuse were reignited, it is likely that this young lady would again regress and revert to bizarre acting-out behavior. I concur with the previous psychological report in her record which terms "a borderline schizophrenic," in that she does appear to have an underlying psychotic thought process, and the stress of re-contacting her biological family is likely to trigger this, cause her to decompensate psychologically, and would likely precipitate psychiatric hospitalization."

B. ["]She has stabilized but she is unsure if she has progressed and has the ability to go in and out of stabilization. She has an impairment which because of her anxiety of her mother there exists a risk of her being pushed into psychosis.["]