**STATE of Utah, in the Interest of M.E.C., a person under eighteen years of age.**

**G.C., Appellant,**

**v.**

**STATE of Utah, Appellee.**

**No. 960550–CA.**

Court of Appeals of Utah.

July 10, 1997.

---

Richard P. Gale, Salt Lake City, for Appellant.

Jan Graham and Carol L.C. Verdoia, Salt Lake City, for Appellee.

Kristen L. Fadel, Salt Lake City, Guardian Ad Litem.

Before WILKINS, BILLINGS and GREENWOOD, JJ.

## OPINION

WILKINS, Associate Presiding Judge:

G.C. appeals the juvenile court's order terminating his parental rights to M.E.C. We affirm.

## BACKGROUND

G.C. is the natural father of M.E.C. M.E.C. was born prematurely on July 19, 1995, with cocaine in her system. On July 20, 1995, the Division of Child and Family Services (DCFS) placed M.E.C. in protective custody at the University Medical Center and petitioned for custody based on neglect. At a pretrial hearing in September 1995, both G.C. and the child's mother admitted the allegations of the neglect petition. The juvenile court gave DCFS custody and guardianship of M.E.C., approved the proposed service plan, and ordered both parents to comply with the plan.[1] The court also ordered DCFS to translate the service plan into Spanish due to G.C.'s lack of proficiency in English. DCFS created a service plan for both parents for the period September 1995 through March 1996, with the goal of returning M.E.C. to her parents. DCFS, however, never translated the service plan into Spanish, in direct violation of the juvenile court's order.

Because DCFS determined that both G.C. and mother had failed to comply with the service plan's terms, DCFS changed the plan's goal to adoption and filed a petition to terminate parental rights. A trial was held on July 15, 1996, in which mother voluntarily relinquished her parental rights to M.E.C. The juvenile court then continued the trial with respect to only G.C.'s parental rights.

The trial proceeded based on the allegations in the State's petition to terminate G.C.'s parental rights. G.C. admitted most of the allegations, including that: (1) he and mother voluntarily relinquished their parental rights to M.E.C.'s older sibling, who also tested positive for cocaine at birth; (2) from 1993 to 1995, DCFS received three neglect/abuse referrals on G.C. resulting in two shelter placements; (3) M.E.C. was born premature, weighed under five pounds, did not suck well, and tested positive for cocaine; (4) mother tested positive for cocaine at M.E.C.'s birth; (5) G.C. had a lengthy criminal record including convictions for lewdness with a child and possession of drugs; and (6) M.E.C. had been residing in the same foster home since November 1995, in which her special needs were being met.

G.C., however, denied three of the allegations in the State's petition. G.C. denied that "numerous offers of special help were made

---

1. On September 5, 1995, G.C. and mother also voluntarily relinquished their parental rights to M.E.C.'s older sibling, who was born October 22, 1993, with cocaine in his system, and who was adjudicated a neglected child on February 8, 1994.

to [G.C.] to aid him in completing the Service Plan objectives," that he "failed or did not substantially comply with the requirements of the Service Plan," and that "it would be in [M.E.C.'s] best interest to be adopted." As to the three allegations G.C. denied, the parties agreed to present the evidence by proffer, an agreement the court accepted.

The State proffered evidence that from September to November 1995, while M.E.C. was in the care of her maternal grandmother, G.C. visited M.E.C. only three times. From November 1995 until July 1996, the time of the trial to terminate G.C.'s parental rights, G.C. neither visited M.E.C. nor contacted DCFS regarding visitation or any of the service plan requirements. G.C. failed to establish a stable residence, moving three times between January and July 1996 without giving DCFS his current address. He also failed to get a psychological evaluation and a drug/alcohol assessment and failed to provide written verification that he attended Alcoholics Anonymous (AA). The State acknowledged that G.C. claimed to have attended three AA meetings, but proffered that he failed to provide DCFS with the required proof. In addition, as recently as June 1996, drug use was seen in G.C. and mother's home.

The State also proffered evidence that DCFS tried on several occasions to contact G.C., but was never able to reach either G.C. or mother and never received any return calls from them. From January 1996 to July 1996, there was no contact between G.C. and his caseworker. G.C. did not request any help from DCFS, did not call his caseworker regarding any of the service plan requirements, and did not request any visits with M.E.C. after his last visit in November 1995. In addition, the State asserted that the DCFS caseworker went to great lengths to ensure G.C. understood the service plan's terms, and that G.C. indicated he understood what was expected of him. The State also proffered evidence that it would be in M.E.C.'s best interest to be adopted because M.E.C. is now in a foster placement that is loving, meets her needs, and in which she is thriving.

G.C. proffered evidence solely relating to his noncompliance with the service plan. G.C. asserted that he failed to comply with the plan's terms because he did not understand what was expected of him. G.C. proffered evidence that his native language is Spanish and that the service plan was never translated into Spanish, as required by court order. Instead, the DCFS caseworker explained the plan in English and also relied on mother to translate and pass the information on to G.C. G.C. argued that he complied with the portions of the plan that he understood, but because of his language barrier and DCFS's reliance on mother to provide the information to him, he did not receive any information regarding the required substance abuse and psychological evaluations or further visits.

Regarding his failure to visit M.E.C., G.C. asserted that he was not given either an address or a visitation schedule. Therefore, because there were no scheduled visits, he did not visit the child after she was moved from the maternal grandmother's care in November 1995. Additionally, he claimed that because of his language barrier, he was relying on mother to provide DCFS with the information regarding their change of address. He also asserted that although he had three different residences, he felt the child could have come to live with him in those residences, but that DCFS never initiated any home visits. He proffered that he had been employed throughout the entire year DCFS was working with the family. G.C. asserted that he attended numerous AA meetings, but that he did not receive either the substance abuse or psychological evaluations because DCFS did not schedule evaluation appointments for him. Further, G.C. claimed to have not used illegal substances during the year in which he was required to comply with the service plan.

Based on the proffered evidence, the State asked the court to terminate G.C.'s parental rights on the following grounds: (1) abandonment because G.C. had no contact with M.E.C. for about seven months beginning November 1995 through July 1996; (2) unfitness due to G.C.'s admitted criminal history regarding drug use and lewdness with a

child; (3) neglect or abuse based on G.C.'s admission that M.E.C. was born with cocaine in her system and the juvenile court's adjudication in September 1995 that M.E.C. was abused and neglected; (4) unwillingness to remedy the circumstances that caused the out-of-home placement based on G.C.'s non-compliance with the service plan, continued drug use, lack of a stable residence, and failure to visit with the child for seven months, despite DCFS's diligent efforts to provide services to G.C.; (5) failure of parental adjustment because G.C. had not substantially complied with the service plan; and (6) token efforts to support and communicate with M.E.C.

On July 18, 1996, the juvenile court ordered the termination of G.C.'s parental rights. The court found that termination was not appropriate on the grounds of abandonment, under Utah Code Ann. § 78–3a–407(1) (1996), because the State had not proven by clear and convincing evidence that G.C. abandoned the child. The court also specifically found that DCFS had not made diligent efforts to provide appropriate services. Thus, the termination of G.C.'s rights based on parental failure to remedy the circumstances that caused the out-of-home placement, under Utah Code Ann. § 78–3a–407(4) (1996), was unsupported. However, the court found the proffered evidence sufficient to support the termination of G.C.'s parental rights based on unfitness, neglect, failure of parental adjustment, and token efforts. G.C. appeals.

## ANALYSIS

G.C. does not challenge the sufficiency of the evidence relied on by the juvenile court to terminate his parental rights. G.C. also does not challenge the individual grounds the court found in support of termination. Instead, G.C. appeals the juvenile court's decision to terminate his parental rights by arguing (1) that the State has a duty to offer a parent rehabilitative services before terminating parental rights when that termination is grounded upon "subtle forms of abuse and neglect," as in this case, and (2) that the services DCFS provided G.C. were insufficient to assist G.C. in his rehabilitation. The

State argues that, under the facts of this case, there is no duty pursuant to the 1994 Child Welfare Reform Act, which incorporated the previously enacted Termination of Parental Rights Act, to provide rehabilitation services before seeking termination of G.C.'s parental rights.

### DCFS's Failure to Translate the Service Plan

G.C. argues that because DCFS failed to provide *court-ordered* services, the juvenile court erred in ordering the termination of his parental rights. G.C.'s argument relies solely on DCFS's violation of the juvenile court's order to translate the service plan into Spanish. The facts show that DCFS recommended to the juvenile court that a service plan be created to assist G.C. in working toward reunification with his child. The court agreed and ordered that such a plan be formulated and translated into Spanish. However, at the hearing to terminate G.C.'s parental rights, the juvenile court found the plan had not been translated as ordered. As such, the court explicitly found that DCFS failed to make " 'diligent' efforts to provide 'appropriate' services in light of [G.C.'s] asserted language barrier."

We are greatly troubled by DCFS's apparent disregard of the court's order to translate the service plan and find its violation of this order egregious. Where a service plan is not communicated to the parent, in effect, no plan has been provided. Thus, the State cannot rely on any alleged failure by the parent to comply with such a plan in considering later action. In light of DCFS's failure to provide diligent services, the juvenile court correctly declined to rely on any grounds for termination that involved any alleged failure by G.C. to comply with the service plan. Nevertheless, the juvenile court found sufficient grounds, independent of the service plan, upon which to order the termination of G.C.'s parental rights. According to the court's findings, those grounds existed at the time the plan was ordered, and continued to exist at the time of the termination hearing. Therefore, we determine whether the juvenile court's findings under section 78–3a–407, which do not rely on

G.C.'s failure to comply with the service plan, and its subsequent decision to terminate G.C.'s parental rights, are clearly erroneous.

## State's Duty to Provide Rehabilitation Services

G.C. originally asserted that the State has an absolute duty to provide rehabilitation services to parents prior to terminating their parental rights. He referred in his brief to cases from this court and from our supreme court suggesting the possible existence of a duty, beyond that set forth in statute, by which the State is obligated to assist an unfit parent in an effort to prevent termination of parental rights.

During oral argument, however, G.C. conceded that any claimed statutory or constitutional right to rehabilitation services that may exist does not extend to all situations. Nevertheless, G.C. asserts that, under the facts of this case, the State had a duty to provide services to assist in his rehabilitation because the grounds the juvenile court relied upon to terminate his parental rights constitute subtle forms of abuse and neglect. *See State ex rel. J.L.W.*, 900 P.2d 543, 547 (Utah. Ct.App.1995). Relying on this court's opinion in *State ex rel. J.L.W.*, G.C. argues existing law mandates that the State provide rehabilitation services in this case.

In *J.L.W.*, this court acknowledged that the State's duty to offer help may arise in a narrow range of cases involving subtle forms of abuse and neglect and that there is "no duty to offer rehabilitative services to parents in cases of obvious physical abuse, neglect, or abandonment." *Id.* at 546. Subtle forms of neglect or abuse have been defined as "patterns of unintended behavior that create an inadequate environment for the child, such as by interfering with the child's education or social development." *Id.* at 547. G.C. essentially asserts that he did not intend either to fail to protect or to fail to take an interest in M.E.C. These forms of neglect and abuse, he says, are "subtle." Therefore, he claims the State had a duty to assist in his rehabilitation.

■ We disagree. The case law upon which G.C. relies predates the current statutory scheme that applies to this case. Under the current Termination of Parental Rights Act, codified under Utah Code Ann. § 78–3a–401 to –414 (1996) and effective July 1, 1994, a statutory duty does not exist requiring the State to first provide rehabilitation services in all circumstances before terminating a parent's rights.[2]

Under the plain language of section 78–3a–407, a juvenile court may terminate all parental rights if it finds any *one* of the following:

(1) that the parent or parents have abandoned the child;

(2) that the parent or parents have neglected or abused the child;

(3) that the parent or parents are unfit or incompetent;

(4) that the child is being cared for in an out-of-home placement under the supervision of the court or the division, *that the division or other responsible agency has made a diligent effort to provide appropriate services* and the parent has substantially neglected, wilfully refused, or has been unable or unwilling to remedy the circumstances that cause the child to be in an out-of-home placement, and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future;

(5) failure of parental adjustment, *as defined in [section 78–3a–403(2)]*;

(6) that only token efforts have been made by the parent or parents:

(a) to support or communicate with the child;

(b) to prevent neglect of the child;

(c) to eliminate the risk of serious physical, mental, or emotional abuse of the child; or

(d) to avoid being an unfit parent[.]

Utah Code Ann. § 78–3a–407(1)–(6) (1996) (emphasis added). Section 78–3a–403(2) defines "failure of parental adjustment" to mean that a parent

---

2. G.C. makes no claim of a constitutional right to rehabilitative services apart from the statutory right discussed in those prior decisions. Accord-

ingly, we express no opinion regarding the existence of any such constitutionally founded duty.

[is] unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of [his or her] child outside of [his or her] home, *notwithstanding reasonable and appropriate efforts made by [DCFS]* to return the child to that home.

Utah Code Ann. § 78–3a–403(2) (1996) (emphasis added).

■ Both the State and G.C. agree that under the plain language of section 78–3a–407, only two of the statutory grounds require the juvenile court to first find that the State provided reasonable and adequate services before terminating parental rights. To terminate parental rights under section 78–3a–407(4) (the failure to remedy the circumstances which caused the out-of-home placement) and section 78–3a–407(5) (the failure of parental adjustment), the juvenile court is required to find that DCFS first provided "diligent" or "reasonable" services. However, because no such finding is required for the other grounds for termination, a juvenile court has the statutory authority to order the termination of a parent's rights based on finding abandonment, neglect, unfitness, and token efforts, regardless of whether the State provided any services, reasonable or not.

In this case, the juvenile court found that DCFS failed to make a diligent effort to provide "appropriate services" in that it failed to translate the service plan into Spanish. However, the court found clear and convincing evidence of neglect, unfitness, failure of parental adjustment, and token efforts. Based on these statutory grounds, the court terminated G.C.'s parental rights.

■ On appeal, we will disturb the juvenile court's decision to terminate parental rights " 'only if the findings are clearly erroneous.' " *State ex rel. P.H. v. Harrison,* 783 P.2d 565, 570 (Utah.Ct.App.1989) (citation omitted). This court will find clear error if we are convinced that a mistake has been made, or if the findings are against the clear weight of the evidence. *See N.T. v. State,*

928 P.2d 393, 398 (Utah.Ct.App.1996). The clearly erroneous standard requires the parent challenging the juvenile court's findings to marshal the evidence supporting the findings and then show that the findings are so lacking in support that they are against the clear weight of the evidence. *See State ex rel. P.H.,* 783 P.2d at 565 n. 1.

■ Initially, we conclude that the court's finding of failure of parental adjustment, under Utah Code Ann. § 78–3a–407(5), is clearly erroneous. As previously discussed, a finding of failure of parental adjustment necessarily requires a finding that DCFS made "reasonable and appropriate efforts" under section 78–3a–403(2). The juvenile court's express finding that DCFS failed to make a "diligent effort" to provide services is directly contrary to, and cannot support, a finding of failure of parental adjustment. As such, the termination of G.C.'s parental rights cannot be grounded upon the failure of parental adjustment.

■ The juvenile court, however, also found neglect, under section 78–3a–407(2), and unfitness, under section 78–3a–407(3). Either ground—unfitness or neglect—can independently support the juvenile court's order to terminate G.C.'s parental rights. G.C., however, does not challenge these findings as clearly erroneous and fails to direct this court's attention to any contrary evidence. As a result, we accept these findings as adequately supported by the record and hold that the juvenile court properly terminated G.C.'s parental rights.[3] *See State ex rel. P.H.,* 783 P.2d at 570 (presuming correctness of findings because parent failed to marshal evidence and failed to point to any evidence contrary to court's findings).

## CONCLUSION

The plain language of the new Termination of Parental Rights Act does not require DCFS to provide rehabilitation services before proceeding to terminate a parent's rights in every circumstance. Because the

---

3. The court also found that, under Utah Code Ann. § 78–3a–407(6)(a) (1996), G.C. made only token efforts to support and communicate with the child. However, because we conclude that

the juvenile court properly terminated G.C.'s parental rights for neglect and unfitness, we need not address the finding of token efforts. *See In re J.D.M.,* 808 P.2d 1122, 1125 (Utah.Ct.App.1991).

court terminated G.C.'s rights upon a finding of neglect and unfitness, and because G.C. did not challenge these findings as clearly erroneous, we affirm the juvenile court's order terminating G.C.'s parental rights.

BILLINGS and GREENWOOD, JJ., concur.